UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| CARL SPITKO and ELIZABETH GOETZ-SPITKO | : | |
| | : | |
| Debtors | | Bankruptcy No. 04-18836 |
| _____ | : | |
| WACHOVIA BANK, N.A. | : | |
| Plaintiff, | : | |
| v. | : | Adversary No. 04-975 |
| CARL SPITKO, and ELIZABETH GOETZ-SPITKO | : | |
| | : | |
| Defendants | | |
| _____ | : | |
| HOWARD GLASSMAN, Trustee | : | Adversary No. 04-1049 |
| Plaintiff, | : | |
| CARL SPITKO, and ELIZABETH GOETZ-SPITKO | : | |
| | : | |
| Defendants | | |
| _____ | | |

.................................................

OPINION

.................................................

In the above-captioned consolidated adversary proceedings[1], the plaintiffs

---

[1] The parties agreed to consolidate the evidentiary record on the two proceedings.  In addition, the trustee and the debtors agreed to sever count V of the trustee's complaint that raised

Wachovia Bank, N.A. and Howard Glassman, the chapter 7 trustee, assert that the

defendants, debtors Carl Spitko and Elizabeth Goetz-Spitko, should be denied their

bankruptcy discharge pursuant to 11 U.S.C. § 727(a)(2)(A), (3), (4), and/or (5).  The

defendants oppose such relief.

In essence, the plaintiffs contend that efforts taken by the debtors prior to

their bankruptcy filing to avoid Wachovia's execution on judgments against them and a

corporation they controlled, where some of the results of those efforts were not disclosed

on their bankruptcy schedules, were fraudulent and should deprive the debtors of their

bankruptcy discharge.  The debtors counter that their conduct was legal and appropriate,

and that any mis-disclosures or non-disclosures in their bankruptcy case were inadvertent.


I.


After a multi-day trial, and upon consideration of all the testimony and

exhibits offered in evidence, as well as upon the parties' stipulation of uncontested facts, I

make the following findings:

1.  The chapter 7 debtors in these proceedings are Carl Spitko and Elizabeth

Goetz-Spitko,[2] husband and wife.

---

a fraudulent conveyance claim.

[2]The debtors in their post-trial memorandum refer to Elizabeth Goetz-Spitko, as simply
Elizabeth Spitko; and so I will refer to her in the same manner.   However, as there are three
Messrs. Spitko of relevance in this proceeding, I shall identify them by their full names.

2.  Carl Spitko was at all times relevant to these proceedings the sole shareholder and president of Maintech, a subchapter S corporation.  Statement of Uncontested Facts at 2.

3.  Maintech began its operations in 1988.  2 N.T. at 206.[3]  The corporation manufactured, distributed, and sold laminators for the printed circuit board industry.  Id. at 170; see 1 N.T. at 8.  It also provided spare parts for and serviced these laminators, as well as related handling equipment and preheater equipment.  2 N.T. at 170.  At times, it also acted as a distributor for other products.  1 N.T. at 8.

4.  On or about July 16, 1999, First Union Bank, to whom Wachovia Bank, N.A. is the successor, loaned Maintech $425,000.   Statement of Uncontested Facts at 2; Ex. P-1; 1 N.T. at 8.  Carl Spitko signed a promissory note in that amount as president of Maintech.  Ex. P-1 at 6.

5.  The debtors personally guaranteed Maintech's obligation to First Union under the July 16, 1999 loan agreement.  Statement of Uncontested Facts at 2; Ex. P-2; 1 N.T. at 8-9.

6.  In June or July 2001, Maintech moved into a facility located at 860 Welsh Road, Huntington Valley, Pennsylvania.  2 N.T. at 183-84, 206.

7.  BTR Enterprises, LLC ("BTR"), a real estate holding company, owned

---

[3]The testimony in this adversary proceeding took place over three days of trial.  The citation, 1 N.T. refers to the first day of testimony, 2 N.T. to the second, and 3 N.T. to the third.

3

the property located at 860 Welsh Road, Huntington Valley, Pennsylvania, where

Maintech's corporate headquarters were located, as well as several acres of land across

the street.  2 N.T. at 183-84.  Carl Spitko was the sole member of BTR.  1 N.T. at 8.

8.  On or about May 25, 2001, BTR and Maintech entered into a secured

reimbursement agreement with First Union in connection with a $2.2 million letter of

credit.  Statement of Uncontested Facts at 3; Ex. P-5; 1 N.T. at 9.  Carl Spitko signed on

behalf of BTR.  1 N.T. at 12.  The debtors also personally guaranteed that reimbursement

agreement.  Statement of Uncontested Facts at 3; Ex P-6; 1 N.T. at 12.  This guarantee

contained a confession of judgment provision.  Ex. P-6.  The reimbursement guarantee

was later reaffirmed in September 2002.  Statement of Uncontested Facts at 3; Ex. P-7.

9.  On or about May 30, 2001, Maintech borrowed an additional $2.5

million from First Union and executed a second promissory note in favor of this lender

for the same amount.  Statement of Uncontested Facts at 3; Ex. P-3; 1 N.T. at 11.  Carl

Spitko signed this note on behalf of Maintech.  Ex. P-3 at 6.

10.  On that same day, Maintech executed a security agreement[4] which gave

First Union a security interest in all of its personal property, including all accounts

receivables, inventory, equipment and deposit accounts.  Statement of Uncontested Facts

at 3; Ex. P-4.  This security interest was perfected with a UCC-1 filing on or about June 7,

2001.  Statement of Uncontested Facts at 3-4.

---

[4]This agreement amended an earlier agreement dated July 16, 1999.  Ex. P-4.

4

11. On October 17, 2001, the debtors submitted a personal financial statement to First Union in connection with the second Maintech loan and their guarantee thereof. See Statement of Uncontested Facts at 4; Ex. P-19; 2 N.T. at 166-67. Carl Spitko reviewed various financial documents in compiling the statement. 2 N.T. at 167-68. In this financial statement, the Spitkos represented that they had assets worth about $4 million. Statement of Uncontested Facts at 4; Ex. P-19 at 2. The following are the assets listed by the debtors on their 2001 financial statement provided to First Union:

| | |
|---|---|
| Cash and Short Term Investments (Including retirement accounts) | $158,772 |
| Stocks and Bonds | $187,440 |
| Personal Property ("conservative") | $48,000 |
| Automobiles | $65,000 |
| Real Estate Personal Residence | $750,000 |
| Real Estate- Investments | $1,725,000 |
| Maintech, Inc. (Book Value) | $1,100,000 |

Ex. P-19.

12. As of the date of this financial statement, the Spitkos also reported a joint annual income of $649,939. Ex. P-19 at 2. Additionally, the debtors disclosed annual expenses totaling $306,777, which included: home mortgage payments totaling $47,210; loan payments totaling $6,000; income tax (state and federal) totaling $204,567; general living expenses totaling $40,000; and au pair expenses totaling $9,000. Id.

13. On April 29, 2002, the debtors submitted a second personal financial statement to First Union. See Statement of Uncontested Facts at 4; Ex. P-20; 2 N.T. at

168-69.  The debtors' assets were valued at more than $4.5 million in this second

statement.  Statement of Uncontested Facts at 4; Ex. P-20.  Those assets included:

| | |
|---|---:|
| Cash and Short Term Investments | $334,700 |
| (Including retirement accounts and stock and bonds) | |
| Notes & Account Receivables | $60,000 |
| Cash Surrender Value- Life Ins. | $2,000 |
| General/Ltd. Partnership Interest | $1,950,000 |
| Personal Property (conservatively) | $100,000 |
| Automobiles | $60,000 |
| Real Estate- Personal Residence | $910,500 |
| Other Assets | $1,200,000 |

Ex. P-20.  Of the cash and short term investments, $107,400 is identified as being in

various retirement accounts.

14.  As of April 29, 2002, the Spitkos reported a combined annual income

of $557,800.  Ex. P-20.  Additionally, the debtors had annual expenses totaling $276,400,

including: home mortgage payments totaling $36,000; loan payments totaling $8,400;

income tax (state and federal) totaling $180,000; general living expenses totaling

$40,000; and au pair expenses totaling $12,000.  Id.

15.  The debtors on their second financial statement to First Union

estimated the value of their personal residence at $910,500, based on the opinion of a real

estate agent.  2 N.T. at 172-73.

16.  Neither the first nor the second financial statements given to First

Union reveal a secured or unsecured obligation owed by the Spitkos to Mr. John E.

Spitko, Sr., Carl's father.  See Exs. P-19, P-20; 1 N.T. at 81, 83.

6

17.  In the latter part of 2001 and early 2002, Maintech experienced a significant downturn in its business.  Maintech's largest customers closed their operations or transferred them overseas.  2 N.T. at 171-72.  Based upon its reduced operating income, Maintech ultimately defaulted on its loan obligations to Wachovia, and the lender demanded immediate payment of the entire first and second loan obligations.  Statement of Uncontested Facts at 5.  Maintech and the debtors, as guarantors, did not repay Wachovia's demand.  Id.

18.  On or about May 6, 2002, Craig M. Spencer, RAA, CREA, acting on behalf of Prudential Bank (a mortgagee on the debtors' residence) performed an appraisal of the debtors' home and valued it at $800,000.  Statement of Uncontested Facts at 4.

19. On or about May 15, 2003, Wachovia filed a complaint in confession of judgment against the debtors in the amount of $3,563,148.17 (due under the promissory notes and letter of credit) captioned Wachovia Bank, National Association v. Carl W. Spitko and Elizabeth A. Goetz-Spitko, et al. in the Montgomery County Court of Common Pleas.  Statement of Uncontested Facts at 5-6; Ex. P-9.  A similar action was commenced against Maintech in an action entitled Wachovia Bank, National Association v. Maintech, Inc.  Statement of Uncontested Facts at 6.

20.  On or about May 15, 2003, a judgment in confession was entered against the Spitkos as well as against Maintech by the Prothonotary of the Montgomery

County Court of Common Pleas.  Id. at 5-6; Ex. P-9.  Thereupon, Wachovia began

executing upon the Spitkos' property and Maintech's property, including real and

personal property, such as bank accounts.  2 N.T. at 176-77.

21.  On Friday, June 6, 2003, Maintech ceased operations.  2 N.T. at 62.

22.  On Monday, June 9, 2003, Sentek LLC began operating.  1 N.T. at 132;

2 N.T. at 62.  Carl Spitko testified that Sentek was established because the debtors

"decided to start a completely new company and to basically sever all ties with Maintech

so that we could have a livelihood."  1 N.T. at 133.  The Spitkos held, at the time of the

bankruptcy filing and at all times relevant, the entire membership interest in the LLC

known as Sentek.  Id. at 150; 2 N.T. at 22.

23.  Sentek provided parts, service, and used equipment (e.g., laminators) to

the printed circuit board industry.  2 N.T. at 63.  Sentek hired all of Maintech's employees

as of June 6th and had many of the same customers.  1 N.T. at 133-4; 2 N.T. at 63.

24.  Mr. David Ellis, formerly general manager of Maintech and Sentek,

credibly testified as to Sentek's operations as follows:

Q: Now, were you familiar with the employees of Maintech as
of June 6, 2003?

A: Yes

Q: And were the employees of Sentech [sic], as of June 9th,
2003 the same as the employees of Maintech?

8

A: Yes

Q: And was – were the employees hired in the same capacity for Sentech [sic] that they had provided services for Maintech?

A: Yes

Q: And what did Sentech [sic] do?

A: Sentech [sic] - - I mean, really wasn't any different than what Maintech had done.  It was customers that manufacture printed circuit boards, Sentech [sic] would sell parts, service, some of the equipment used.

Q: Did Sentech [sic] deal with the same customers as Maintech had dealt with?

A: For the most part

2 N.T. at 63.

25.  Deposits continued to be made into Maintech's bank accounts after it ceased operations on June 6, 2003.  Ex. P-28 at 1-13; 1 N.T. at 103-5; 3 N.T. at 63-64. When Maintech ceased its operations, it had outstanding account receivables.  See 2 N.T. at 67.  When customers paid these outstanding receivables, some of the funds were deposited in Maintech's bank account and some were paid to Sentek.  Sentek never repaid Maintech.  Id.  Some Maintech receivables were never collected.  Id.

26.  Sentek, on or after June 9, 2003, received spare parts from Maintech to use in the operation of its business and paid $21,600 for the initial purchase of parts.  1

9

N.T. at 135-36, 144; 2 N.T. at 64-65.  However, after Sentek had operated for some time,

purchase orders were not issued by Sentek when it removed items from Maintech's

inventory, including two shelves of parts taken from Maintech's building.  1 N.T. at 135-

37; 2 N.T. at 65-66.  Carl Spitko estimated that Sentek owes Maintech an additional

$31,000 for those unpaid items.  1 N.T. at 144.  Some of the Maintech items were sold by

Sentek with the proceeds of the sales deposited into Sentek's account.  Id. at 64-65.

There was not an accurate parts inventory for Maintech after the formation of Sentek.  2

N.T. at 144-45.

      27.  After its inception on June 9, 2003, Sentek engaged in the sale of

several laminators.  Id. at 70-72, 128-29.  It is unclear whether these laminators were

owned by the debtors personally or by Maintech.  Id. at 70-72, 115-21, 128-29, 139-46,

149-50.

      28. Wachovia held no security interest in the assets of Sentek.  However, on

December 10, 2003, it brought suit against Sentek in state court alleging that the

corporation was the successor to Maintech and thus liable for Maintech's obligations, and

that it had received fraudulent transfers.  Statement of Uncontested Facts at 6.  On

December 4, 2003, the debtors opened an account on behalf of Sentek at Wilmington

Trust in Delaware.  Exs. P-31 at 1; see also, 1 N.T. at 109-110.  It is likely that the debtors

chose a Delaware bank to reduce the chance of its discovery by Wachovia.

29.  Certain personal property belonging to Maintech probably remains in China and in the state of Indiana.  Id. at 142-43.  The value of this property is not known.

30.  A website still exists for Maintech.  Ex. P-52; 1 N.T. at 138, 142; 2 N.T. at 73-74.  Sentek has never maintained a website and Sentek customers had been referred to Maintech's website.  2 N.T. at 74.  Both Maintech and Sentek opened bank accounts during the period of June 2003 to June 2004.  Exs. P-28; P-30; D-19 at 1181-88, 1195-1237, 1272-1330.

31.  By March 2003, Maintech was in default of payments to Wachovia, and the bank was attempting to collect its debt.  Carl Spitko, on behalf of BTR, decided it was necessary to sell the realty to repay Wachovia in part.  Anticipating such sale, Carl Spitko decided that some of  Maintech's assets should be removed from the realty.  2 N.T. at 186-88.  Shortly before Maintech ceased operations, some Maintech assets were transferred into numerous tractor trailers and stored at the Rentz Storage Facility in Philadelphia.  1 N.T. at 142-43; 2 N.T. at 187.  Thereafter, some of those assets were transferred to Sentek's facility, where certain items remain.  1 N.T. at 142-45.  Other assets remained in the trailers.  Furthermore, the Spitkos also stored some of their personal property at the Rentz Storage Facility.  1 N.T. at 39; 2 N.T. at 80-81.

32.  Funds from the debtors were the source of operating capital for Sentek's startup.  1 N.T. at 134; 2 N.T. at 66.  On June 5, 2003, Carl Spitko wrote a check

11

payable to Sentek in the amount of $40,000.  The memo line of this check reads

"Capitalization of Sentek."  Ex. P-25 at 6; 1 N.T. at 100; see Ex. P-48 at 13.  On June 6,

2003, Carl Spitko authorized a wire transfer from his Artisans' bank account to Sentek in

the amount of $21,600.  Ex. P-25 at 5; 1 N.T. at 99-101.  On July 1, 2003, Carl Spitko

wrote a check payable to Sentek in the amount of $6,000.  The memo line of the check

states "loan from officer."  Ex. P-25 at 1; 1 N.T. at 98.  On July 9, 2003, Carl Spitko

wrote another check to Sentek for $6,500.  The memo line for this check stated "loan

from officer."  Ex. P-25 at 4; 1 N.T. at 99.  On July 18, 2003, Carl Spitko wrote a check

to Sentek for $18,000.  The memo line of this check states "loan from officer."  Ex. P-25

at 2; 1 N.T. at 98.  On July 29, 2003, Carl Spitko drafted another check to Sentek in the

amount of $21,000.  The memo line of this check states "short term loan."  Ex. P-25 at 3;

1 N.T. at 99.

   33.  Although all but one of the above described checks payable to Sentek

state that the funds represented a loan to the corporation, Carl Spitko testified that he

believed all of these funds were capital contributions and not loans.  Ex. P-25 at 1-4; 1

N.T. at 100.  The debtors did not list any loans as payable to them from Sentek on their

bankruptcy schedules.  Exs. P-10 at 1-16, P-11 at 9-24; 1 N.T. at 100.

   34.  Sentek as a limited liability corporation has an operating agreement

dated June 3, 2003.  Ex. P-48.  The agreement states that the Spitkos can withdraw cash

from the company whenever they deem it warranted.  Id.

35.  In July 2003, after judgment had been confessed against Maintech and at Wachovia's request, Mr. Stephen Comley of Comley Auctioneers came to Maintech's facility to appraise Maintech's assets.  Statement of Uncontested Facts at 7; 2 N.T. at 187-89.

36.  Carl Spitko testified that he told Mr. Comley about assets stored off-site and gave him a list of those assets, but that Mr. Comley was not interested in appraising those items.  Id. at 189; 3 N.T. at 56.  However, this testimony is not credible.  Mr. Comley estimated the value of the assets examined in Maintech's facility at only $21,000.  Statement of Uncontested Facts at 7; 1 N.T. at 145.  If, as Carl Spitko stated, removal of items from BTR's building was required due to an impending realty sale, it is likely that the more valuable property would be moved to ensure its safety.  Mr. Comley probably would wish to inspect that property.  Therefore, it is more likely than not that Mr. Comley was unaware of the off-site personalty when he appraised Maintech's assets for Wachovia.

37.  The debtors were deposed prior to their bankruptcy filing in connection with Wachovia's execution on its judgment.  3 N.T. at 12.  At an October 2003 deposition, the debtors gave Wachovia certain business records concerning Sentek.  Id.

38.  In the fall of 2003, after Wachovia had garnished the debtors' bank

13

accounts known to this creditor, the debtors kept a significant amount of cash in their

home.  It was estimated that they kept a total of $80,000 to $90,000 in their home in late

2003 and early 2004.  1 N.T. at 193-95; 2 N.T. at 11-12.

39.  Elizabeth Spitko explained that the debtors wrote checks to cash and

kept this cash in their home in a "safe or paper bag, or somewhere hidden" so "the

[Spitkos] would have money to be able to function on over the coming months because

things were getting very hostile" and "bank accounts were being closed or frozen and we

decided to start taking out cash."  1 N.T. at 193-94, 197-98.

40.  Also to prevent execution by Wachovia, the debtors moved funds

among several of their bank accounts before withdrawing cash from their bank account at

Commerce Bank.  Id. at 197.

41.  From October 2003 to January 2004, cash was withdrawn from the

debtors' bank accounts and used to purchase money orders to pay various creditors.  Ex.

P-11 at 96, 115-50; 1 N.T. at 195-96.  Several money order receipts were attached to

Exhibit P-11, the Spitkos' amended schedules, although the debtors acknowledged that

"there may be some missing."  Ex. P-11 at 115-50; 2 N.T. at 110-11.  The total amount of

the money order receipts attached as part of Exhibit P-11 is $20,033.62.  Ex. P-11 at 115-

50.

42.  The debtors also began paying some of their household bills with

14

cashier checks or money orders, rather than personal checks, because they were concerned that their personal checks would not be honored.  Ex. P-11 at 115-50; 1 N.T. at 58-59.

43.  The total of money order receipts and copies of cashier's checks attached to the debtors' schedules, which reflect payment of household expenses, do not correspond to their current estimate of the amount of cash accumulated by the debtors and stored at their residence; nor do they correspond to disclosed records reflecting the total amount of checks made payable to cash, or payable to Carl Spitko or Elizabeth Spitko during the relevant time period.  See Exs. D-22; P-11 at 47,105,107,109,111; P-17; P-27 at 6; P-42 at 1-17.  Accordingly, the debtors cannot corroborate that all cash maintained by them in their home in late 2003 and early 2004 was spent on ordinary expenses.

44.  On one occasion, Mr. David Ellis went to the debtors' home and was given cash for Sentek by the debtors' former au pair.  1 N.T. at 192-93; 2 N.T. at 14-15.  This cash payment came from the debtors' personal funds, which funds were kept at their residence.  1 N.T. at 192-93; 2 N.T. at 14-15.

45.  A pre-bankruptcy deposition was taken of Elizabeth Spitko on October 16, 2003 by Wachovia's counsel.  2 N.T. at 17.  In this deposition, Mrs. Spitko testified that the debtors had kept cash in their house for a period of time, but at the time of the deposition no cash remained in the house.  Id. at 17-18.  This testimony contradicts her

testimony at the trial that around October 2003 she still kept cash in her home.  Id. at 11.

46.  Elizabeth Spitko did not provide Wachovia with an accounting of the cash that was spent nor did she keep track of "each chuck of cash (that) was taken out."  1 N.T. at 198-99; 2 N.T. at 15.  Carl Spitko testified at trial that household expenses were paid in cash; however, he did not itemize those expenses.  1 N.T. at 59-61, 191-92.

47.  Carl Spitko, prior to the bankruptcy filing and in connection with Wachovia's discovery in aid of execution, prepared a spreadsheet explaining the disposition of cash and other checks from October 2002 to October 2003.  3 N.T. at 17-19, 58-59.  The total amount of the cash detailed in the spreadsheet is $101,000.  Ex. D-22.  However, from August 2002 to March 2004, the debtors wrote checks made payable to cash and to themselves equaling approximately $156,015.24.  Exs. P-11 at 47, 105, 107, 109, 111; P-17; P-42 at 1-15.

48.  The debtors' spreadsheet identified that cash was spent in the following ways between October 2002 and October 2003:

$10,000 in Legal Fees to Ken Cohen, Esquire (May 2003)

$15,000 in Legal Fees to Al Ciardi, Esquire (May 2003)

$19,000 for Refurbishment, Preparation for renting and/or sale of 860 Welsh Road (October of 2002 to October of 2003)

$21,000 Cash contributed to Maintech (October of 2002 to June of 2003)

16

$23,000 household expenses for 13 months (October of 2002
to present)

Ex. D-22 at 3-4.  No Maintech records were maintained with reference to payments

expended to load up the trailers with Maintech's assets.  3 N.T. at 23-24.  Carl Spitko had

some handwritten documents regarding the above described $19,000 of expenses, but

they are no longer in his possession.  Id. at 61.

49.  John E. Spitko, Sr. is the father of Carl Spitko.  1 N.T. at 23; 2 N.T. at

43-44.

50.  The Spitkos executed a promissory note in favor of John Spitko in the

amount of $99,500 which was dated March 13, 2000, payable January 1, 2001.  Ex. P-14.

Elizabeth Spitko could not recall when she signed this note.  Id.; 1 N.T. at 200.

51.  The Spitkos also signed a mortgage on their home located at 1232

Valley Road, Rydal, PA, 19046 in the amount of $99,500 in favor of John Spitko,

securing their promissory note.  Ex. P-15.  This mortgage instrument is dated December

1, 2000, id., more than 8 months after the note was signed and one month before it was

due.  Elizabeth Spitko could not recall when she signed the document.  1 N.T. at 204-5.

The debtors' bankruptcy schedules state that the mortgage was incurred on December 1,

2000.  Ex. P-10, schedule D.   However, the signatures of Carl and Elizabeth Spitko were

not notarized until April 14, 2003.  Ex. P-15 at 4.  The mortgage was recorded with the

Montgomery County Recorder of Deeds on April 16, 2003.  Id. at 1.

17

52. It is more likely than not that the mortgage, which may have been prepared in December 2000—when it probably appeared to Carl Spitko that he would be unable to repay his father by January 1st—was signed on April 14, 2003 and recorded shortly thereafter. The Spitkos were facing financial pressures from Wachovia, which confessed judgment against them in May 2003, and they likely believed that a mortgage would help repay John Spitko. 1 N.T. at 206-07. They probably also believed that recording a mortgage in December 2000 might hamper them in raising future funds for Maintech.

53. Both the mortgage and the promissory note state that the loan obligation to John Spitko was to be paid in full, at 9% interest, on or before January 1, 2001. See Exs. P-14; P-15. The loan was not repaid by January 1, 2001, as the debtors continued to make payments to John Spitko after that date. See Exs. P-39–P-41.

54. The debtors used the proceeds of the loan from John Spitko to lend additional funds to Maintech; Wachovia had requested a capital infusion. 1 N.T. at 201; 2 N.T. at 204-6. Carl Spitko signed a subordination agreement in connection with a new loan with Wachovia. Ex. D-18 at 00752-00756. This subordination agreement makes mention of a loan made by Carl Spitko to Maintech in the amount of $99,500. Ex. D-18 at 00756. No reference is made of any loan made by John Spitko.

55. Exhibit P-41 reveals twelve payments sporadically made by the debtors

18

to John Spitko between May 2000 and September 2003.  These payments total $111,973.

Id.  Of this total, $66,000 was paid in September 2003.  Id.  In January 2004, John Spitko

purportedly loaned the debtors $15,000; and loaned them another $20,000 in March 2004.

Ex. P-41 (referred to as a partial return of the September 2003 payment.[5])

    56.  On February 17, 2003, Elizabeth Spikto wrote a check to John Spitko in

the amount of $5,200 from her personal checking account.  Ex. P-17; 1 N.T. at 76-77,

210-11.  She did so at the request of her husband and did not know the reason for this

payment.  1 N.T. at 209-10.  Carl Spitko testified that this sum was in partial repayment

of a loan made to him by John Spitko in 1986.  Id. at 77-8.  He testified that there was no

promissory note, no repayment terms, and no deadline for repayment of this 1986 loan.

Id.

    57.  Given that Maintech and the Spitkos were experiencing severe

difficulties in repaying Wachovia in February 2003, given Maintech's loss of income,

given that Elizabeth Spitko was not aware of any 1986 loan, given the still outstanding

loan to John Spitko from 2000, I find it is likely that this February 2003 payment was

made to ensure that Carl's father obtained these funds instead of Wachovia and was not

made in repayment of an unwritten obligation almost 20 years old.

    58.  Mr. David Ellis was employed at Maintech from 1998 to 2003 in

---

[5]Although the issue of the claim of John Spitko is not presently before me, I observe that
neither the 2000 promissory note nor the mortgage refer to future advances.

19

several positions, ultimately becoming general manager.  2 N.T. at 60-61.  He was also

Sentek's general manager.  1 N.T. at 108; 2 N.T. at 63.  His responsibilities included

overseeing Maintech's financial records.  2 N.T. at 61.

59.  After Maintech went into default on Wachovia's loan, in the spring of

2003 and continuing into the fall of 2003, the debtors paid Mr. Ellis between $20,000 and

$35,000 in cash.  Id. at 74-75.  Mr. Ellis was instructed by Carl Spitko to deposit these

cash payments into Mr. Ellis's personal bank account and use the funds to pay Maintech

suppliers.  Id. at 75-78.  Mr. Ellis also used some of the money to buy a computer server

for Sentek, and to pay for storage of equipment owned by Maintech and the debtors at the

Rentz Storage Facility.  Id. at 75-78, 81.

60.  Subsequently, Mr. Ellis was advised by Carl and/or David Spitko

(Carl's brother, 1 N.T. at 32) to pay Maintech the amount of cash given to him, so it

would appear as if Maintech had loaned money to Mr. Ellis and he was repaying the

corporation.  Id. at 77-78.  Mr. Ellis was then given additional cash by the debtors, which

he used for this purpose.  Id.  There was never any loan from Maintech to Mr. Ellis.  Id.

61.  On May 12, 2003, a federal income tax refund for the 1996 tax year in

the amount of $374,011 was paid to the Spitkos.  See Statement of Uncontested Facts at

5; Ex. P-23 at 1.  The debtors subsequently deposited this check in their Artisans' Bank

account, which account they first opened on May 22, 2003 in Wilmington, Delaware.  Ex.

20

P-23 at 2; 1 N.T. at 91-93.  The debtors do not reside in Delaware.  1 N.T. at 91-92.  They

opened a Delaware account because it would be unlikely to be discovered and executed

upon by Wachovia.  2 N.T. at 7-8.

   62.  As a response to a pre-bankruptcy discovery request by Wachovia, Carl

Spitko prepared a document itemizing how the 1996 tax refund was spent by the debtors.

See Ex. P-24; 1 N.T. at 94; 3 N.T. at 25-26.  He listed the various expenditures and

account deposits thusly:

| | | |
|---|---|---|
| Initial Deposit | 5/22/03 | $379,456 |
| Interest Deposit | 6/1/03 | $152.74 |
| Cash Withdrawal, used for packing supplies and labor for cleaning up the warehouse | 6/5/03 | $501.50 |
| Sentek, LLC start up funds/capitalization of Sentek | 6/5/03 | $40,000 |
| Heimbach, Spitko, & Heckman, Legal Fees | 6/5/03 | $25,000 |
| Wire Transfer Fee | 6/6/03 | $15 |
| Wire Transfer to Monocrystal, Maintech Vendor | 6/6/03 | $21,600 |
| David Ellis, Reimbursement for purchasing a server, software, peripherals, and printer for Sentek | 6/6/03 | $10,000 |
| T-Mobile for startup of Sentek cell phones | 6/9/03 | $1,612.95 |

Staples for necessities for Sentek's office
                              6/9/03        $714.98


Cash Withdrawal for packing supplies and labor
for cleaning up the warehouse    6/11/03    $502


Canon USA, Maintech Vendor     6/11/03      $6,851.60


Circuit City for Sentek Single Line Cordless Phone
                              6/12/03       $211.99


Home Depot, extension cords and other wiring
                              6/16/03       $37.06


Cash withdrawal for packing supplies and labor
for cleaning up the warehouse    6/16/03    $501.50


ElPrinting.com, printing literature for Sentek
                              6/16/03       $125.85


AtomicPark.com, multiline phone system for Sentek
                              6/16/03       $1,195


NKS, National Knife, Maintech Vendor, pay by phone
                              6/16/03       $1,595


NKS, National Knife, Maintech Vendor, pay by phone
                              6/16/03       $2,200


Cash withdrawal for packing supplies and labor for cleaning up the
warehouse                     6/17/03       $501.50


Mailing costs, to send a sample of router bits to Japan, USPS
                              6/17/03       $36


Home Depot, other assorted necessities to establish the
     Sentek office            6/17/03       $210.94


22

Fedex Shipment, documents to Al Ciardi    6/18/03    $16.56

Office Max, necessities for establishing the Sentek office, toner cartridge
6/18/03    $219.84

AtomicPark.com, some kind of refund, I think for shipping charge
6/19/03    $23

AtomicPark.com, refund for the multiline phone system for Sentek
6/19/03    $1,195

AtomicPark.com, payment for the multiline phone system for Sentek
6/19/03    $1,172

Carl Spitko, deposited in Mellon Bank, to pay personal credit card bills that
were all liabilities for Maintech travel expenses and BTR 860 Welsh Rd.
maintenance and modernization costs
6/23/03    $97,615

Dell Marketing, 4 Desktop PC's for Sentek Network, ordered on 6/6/03,
charge appearing on this date
6/23/03    $2,497.36

9th Tee Enterprises, personal expense
6/26/03    $79.45

Interest Deposit             6/30/03    $272.13

Exxon/Mobil, gas for personal vehicle
6/30/03    $20.79

Card Replacement Fee, Bank Card was lost
6/30/03    $5.00

Sentek LLC, startup funds/capitalization of Sentek
7/1/03    $6,000

Order for new checks, Clarke American, automatic
withdrawal

| | | |
|---|---|---|
| | 7/2/03 | $10.01 |

Sentek, LLC, startup funds/capitalization of Sentek

| | 7/9/03 | $6,500 |

Sentek, LLC startup funds/capitalization of Sentek

| | 7/18/03 | $18,000 |

Sentek, LLC startup funds/capitalization of Sentek

| | 7/29/03 | $21,000 |

Interest Deposit                7/31/03        $143.46

Heimbach, Spitko, and Heckman, legal fees

| | 8/5/03 | $15,000.00 |

Interest Deposit                9/1/03         $97.89

John E. Spitko, Sr. interest payment on 3rd mortgage

| | 9/12/03 | $6,000 |

Cash Withdrawal, used for trip to China.  In most cases, cash
is required for travel within China mainland

| | 9/15/03 | $501.50 |

Cash Withdrawal, used for packing supplies and labor for
cleaning up the warehouse        9/17/03        $501.00

Interest Deposit                9/30/03        $84.66

Cash Withdrawal, used for packing supplies and labor for
cleaning up the warehouse        9/30/03        $481.50

Cash Withdrawal, used for packing supplies and labor for
cleaning up the warehouse        10/1/03        $501.50

24

| | | |
|---|---|---|
| John E. Spitko, Sr. payment on mortgage | | |
| | 10/1/03 | $60,000 |
| Citibank, payment on credit card bill | | |
| | 10/2/03 | $4,327.58 |
| Ken Cohen, Esq., legal fees | 10/3/03 | $5,000 |
| Heimbach, Spitko, and Heckman, legal fees | | |
| | 10/3/03 | $20,000 |
| Insufficient Funds charge | 10/8/03 | $30 |
| Cash Withdrawal, used for packing supplies and labor for | | |
| cleaning up the warehouse | 10/13/03 | $502 |
| Insufficient Funds charge | 10/14/03 | $30 |
| Deposit for First Republic Bank | 10/15/03 | $1,400 |
| Balance as of 10/26/03 | | $573.92 |

Ex. P-24; 1 N.T. at 94-97.

63. The Spitkos used a portion of their tax refund to pay Maintech suppliers, after Maintech had ceased operating, for the benefit of Sentek. Ex. P-24 at 1; 1 N.T. at 95-96.

64. On January 30, 2004, the debtors deposited $15,000 into their Willow Grove bank account; they were unable to identify the source of that deposit. Ex. P-11 at 33; 1 N.T. at 46-47, 177-78. On January 28, 2004, Elizabeth Spitko wrote a check in the amount of $15,000 from the Willow Grove Bank account to the law firm of Heimbach, Spitko, & Heckman ("HSH"). Ex. P-34 at 4. The memo line of the check read "retainer."

25

Id.  This was the next check to clear following the deposit.  Ex. P-11 at 33; 1 N.T. at 47-48, 178.

65.  On March 22, 2004, approximately $20,000 was deposited into the debtors' joint account at Commerce Bank from funds received from John Spitko.  Ex. P-11 at 101; 1 N.T. at 188-90.  On the same day, Elizabeth Spitko wrote a check to HSH for $18,500.  Exs. P-34 at 5; P-11 at 101; 1 N.T. at 58.  The memo line of the check read "retainer."  Ex. P-34 at 5.

66.  Maintech loaned Sentek $12,000 on March 26, 2004, but there were no loan documents and/or corporate records evidencing the loan.  1 N.T. at 107-8.

67.  Both Exhibit D-22, the prepetition document detailing the Spitkos' disposition of cash, and Exhibit P-24, the prepetition document itemizing the dispersal of the debtors' tax refund, were created by Carl Sptiko and were provided to Wachovia.  Id. at 94; 3 N.T. at 17-18.   However not all of this information was disclosed to the trustee as part of the debtors' bankruptcy schedules and statement of financial affairs.

68. HSH represented Mainteck, Sentek and the Spitkos individually in a variety of legal matters, including contract litigation, employment issues and Wachovia claims, during the period of June 2003 to June 2004.  1 N.T. at 67; 2 N.T. at 26, 37-40, 53-54 ; see Exs. P-32; P-33.  HSH probably had engagement agreements with Maintech, Sentek and the debtors personally.  2 N.T. at 29.

69. David Spitko, Esquire is one of the partners of HSH and is Carl Spitko's brother. 2 N.T. at 24. There are four attorneys at that law firm. Id. at 24-25.

70. On June 5, 2003, a $25,000 escrow payment was made by the debtors to HSH. See Exs. P-34; 1 N.T. at 121. The memo line of the check reads "from Carl and Lisa [Elizabeth] Spitko for Maintech." 1 N.T. at 121; see Ex. P-34 at 1. Exhibit P-32 contains invoices from HSH dated from July 24, 2003 to July 30, 2004. All of these invoices were addressed to Carl Spitko as president of Maintech. Ex. P-32; 1 N.T. at 119-20; 2 N.T. at 31-39. These invoices were sent monthly. 1 N.T. at 123-24.

71. It is clear that, except for a small portion of the work performed prior to or on June 6, 2003, all of the legal services represented by these invoices were rendered after Maintech ceased operations. See Ex. P-32; 2 N.T. at 31. It is also clear that the Spitkos paid from their own funds for legal services on behalf of Maintech. However, to the extent that such services involved Wachovia's claim against Maintech, the Spitkos were also guarantors of that claim.

72. Exhibit P-33 contains invoices sent to Sentek from July 24, 2003 to June 3, 2004. Ex. P-33; 2 N.T. at 40-42. The invoices in this exhibit are addressed to Sentek. See Ex. P-33.

73. Although many of the HSH invoices listed Maintech or Sentek as the payee, legal services were also rendered by HSH to the debtors. 2 N.T. at 26-27. The

27

payments made by the debtors to HSH for legal services rendered in 2003 and 2004 were made out of their personal funds.  1 N.T. at 126-28.  On August 5, 2003, the debtors paid HSH an additional $15,000 into the escrow fund.  Exs. P-11 at 186; P-34; P-36; 1 N.T. at 121-22.  The memo line of the check read "retainer."  Ex. P-34 at 2.  On September 1, 2003, the debtors wrote a check in the amount of $20,000 from their Artisans' bank account made payable to HSH.  Id.; see Ex. P-11 at 186; 1 N.T. at 121-22.  The memo line of the check read "retainer."  Ex. P-34 at 3.  An additional escrow payment to HSH was made on October 2, 2003 in the amount of $20,000.  Exs. P-11 at 186; P-34; P-36; 1 N.T. at 71, 122, and 178.

74.  For the period from June 2003 to December 2004, Sentek also paid $30,680.61 for legal fees.  Ex. P-12 at 2; 1 N.T. at 66-67.[6]  Carl Spitko was unable to identify at the trial the law firms to which legal fees were paid without consulting Sentek's records, which records were not available at trial.  1 N.T. at 66-67.

75.  Fishbine Accountants, which had provided accounting services for Maintech, 1 N.T. at 15; 2 N.T. at 79, also provided services to Sentek to establish its accounting system and reconcile certain banking records. 1 N.T. at 22, 65.  From June 2003 to December 2004, Sentek paid $18,750 to Fishbine for accounting services.  Ex. P-

---

[6]Although Exhibit P-12 indicates the statement covers the period from January 2003 to December 2004, it is clear that Sentek was not established until June of 2003.  Therefore, the January date is incorrect.  1 N.T. at 63.

12 at 2; 1 N.T. at 18, 65-66.

76.   On or about May 6, 2004, Wachovia filed a Praecipe for a Writ of
Execution against the debtors' residence.  Statement of Uncontested Facts at 6.  On or
about May 12, 2004, Wachovia served the Spitkos with a notice of a sheriff's sale of their
home.  Id.  That sale was scheduled for June 30, 2004.  Id.

77.   Prior to the Spitkos's bankruptcy filing, Wachovia received various
payments that reduced the amount owed to it by Maintech, BTR and the debtors.  In 2003
and 2004, BTR sold its realty and the net proceeds of sales were paid to Wachovia.
Statement of Uncontested Facts at 7; 3 N.T. at 27.  Wachovia received $1,478,931.25
from the BTR sales proceeds.  Statement of Uncontested Facts at 7.  Wachovia also
received additional monies from Maintech receivables.  Id. at 7.  All parties stipulated
that the amount of the debt claimed due and owing by the Spitkos to Wachovia as
guarantors as of August 18, 2005 was $2,214,870.75.  Ex. P-8.

78.   On June 29, 2004, one day before the scheduled execution sale of their
home, the Spitkos filed a bankruptcy petition under chapter 7.  Id. at 6.

79.   Both Maintech and Sentek had open bank accounts on the date of the
debtors' bankruptcy filing.  Exs. P-28 at 1; P-30 at 1; P-31 at 11-12; D-19 at 1237, 1321.

80.   Sentek has never filed any income tax returns.  1 N.T. at 66.  Maintech
has not filed an income tax return since 2001.  Id.  The debtors have not filed any tax

29

returns since 2001.  Id. at 66, 90.

81.  Maintech and Sentek have not filed the overdue tax returns because their financial records and accounting were deficient.  Id. at 90-1; 3 N.T. at 65-67.  Carl Spitko explained Maintech's and Sentek's failures to file tax returns: "[w]e simply did not have the correct accounting in order to do that.  We just simply could not do it. . . .  If we had the energy and some more time other than the 80 or 90 hours a week that I was working, we might have been able to do it, but it wasn't physically possible."  3 N.T. at 65-66.  He further complained that even some of the partial accounting work done for these corporations contained errors that must be corrected, and he has neither the time to do it himself, nor funds to hire someone else to do it.  Id. at 87.

82.  The Spitkos believe that they cannot file individual or joint tax returns without Sentek and Maintech first filing corporate tax returns.  1 N.T. at 112.

83.  On March 6, 2003, Maintech filed an extension to file its 2002 federal tax return until September 15, 2003.  Ex. D-19 at 978.  The debtors also filed two extensions to file their 2002 federal return, and one extension for the Pennsylvania income tax return.  Id. at 981-983.  No further extension requests for 2002 were ever filed by the debtors.  3 N.T. at 66.  The debtors did not file an extension request for 2003, but one was filed for 2004.  Ex. D-19 at 984; 3 N.T. at 66-67.  As of the date of the trial, no tax returns had yet been filed.  3 N.T. at 67.

84.  The financial records of Sentek and Maintech have been in the
possession of the FBI since August 2005.  1 N.T. at 16.

85.  Despite this, Carl Spitko unpersuasively testified that Sentek's records
were fairly accurate at the time of his bankruptcy filing.  3 N.T. at 54-55.  He additionally
testified that Maintech's reconciliation work had been completed up to September 2003 at
the time of his bankruptcy petition.  Id. at 53.  The incompleteness and inaccuracies of
these corporate records make it difficult for the chapter 7 trustee to liquidate the value of
the debtors' interest in Sentek for the benefit of creditors.

86.  The debtors filed their initial bankruptcy schedules and statement of
financial affairs on July 30, 2004.  See Ex. P-10.[7]  On June 30, 2004, Howard T.
Glassman, Esquire was appointed chapter 7 trustee.  At the initial section 341 meeting on
October 5, 2004, the trustee directed the Spitkos to file amended schedules and an
amended statement of financial affairs within 10 days.  Statement of Uncontested Facts at
6.  It is likely that Wachovia attended this initial meeting of creditors.

87.  On November 10, 2004, the Spitkos filed amended schedules and an
amended statement of financial affairs.  See Statement of Uncontested Facts at 7; Ex. P-

_____

[7]I take judicial notice, under Fed. R. Evid. 201 (incorporated into bankruptcy cases by
Fed. R. Bankr. P. 9017), of the docket entries of this proceeding. See Maritime Electric Co., Inc.
v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); Levine v. Egidi, 1993 WL
69146, at *2 (N.D. Ill. 1993); In re Paolino, 1991 WL 284107, at *12 n.19 (Bankr. E.D. Pa.
1991); see generally In re Indian Palms Associates, Ltd., 61 F.3d 197 (3d Cir. 1995).

11.  The amended schedules were largely prepared by Carl Spitko.  However, Elizabeth

Spitko was involved in the preparation of the amended Schedule J.  1 N.T. at 153-54, 159,

163.  Carl Spitko was in Hong Kong when the initial bankruptcy schedules were

prepared.  Id. at 36-37, 167-68.

88.  The Spitkos' original schedule D disclosed that John Spitko held a third

mortgage on the debtors' residence, dated December 1, 2000, totaling $96,574.  Ex. P-10

at 6.  John Spitko was also listed on the original schedule F as having an unsecured claim

in the same amount.  Id. at 10.  The debtors' amended schedule D repeats that John Spitko

held a third mortgage dated December 1, 2000, but in the amount of $104,632.54.  Ex. P-

11 at 14.  He is not listed as an unsecured creditor.  Id. at 17-20.

89.  On the Spitkos' amended statement of financial affairs, in response to

the question seeking information concerning payments to creditors within 90 days, they

responsed, "see attached Exhibit A," which exhibit included copies of various bank

statements and copies of money orders from October 2003.  Ex. P-11 at 2; see Ex. P-11 at

31-184.  When asked to reveal all payments made to insiders within the previous year, the

Spitkos' amended statement discloses only HSH, and as to dates of payments says, "see

attached Exhibit B."  Ex. P-11 at 2.  Exhibit B provides a list of the escrow payments and

charges against the escrow account from June 6, 2003 to June 7, 2004.  Id. at 186.

Payments made by the Spitkos to Sentek were not listed on the amended statement of

financial affairs nor were they included as part of the attached bank statements.  Id. at 2.[8]

90.  On neither the original nor the amended statement of financial affairs do the Spitkos reveal all payments made to John Spitko within one year prior to their bankruptcy filing.  Some payments could be discovered by analyzing carefully the numerous documents attached to the amended filing; however, the copies of attached records from Artisan Bank begin only in December 2003, and so do not disclose the September 2003 payments totaling $66,000.

91.  The Spitkos' amended Schedule A lists the value of their home, located at 1232 Valley Road, Rydal, Pennsylvania at $715,000.  The amount of the secured claims is disclosed as $699,224.65.  Ex. P-11 at 9.

92.  The Spitkos also disclose a timeshare interest in California real estate, which interest is valued at $2,000, with no secured liens.  Id.  The Spitkos did not normally have rental income from the use of this realty, 2 N.T. at 6; 3 N.T. at 71-72, and unused time is not transferrable.  3 N.T. at 73.

93.  Carl Spitko testified that he estimated the value of his residence by consulting an appraiser, and the value of the time share by informally consulting with a California realtor.  1 N.T. at 20-21; 2 N.T. at 174-75; 3 N. T. at 32-34.

94.  On the amended schedule B, the Spitkos disclose the following

_____

[8]By virtue of section 101(31)(A)(iv), Sentek would be an insider of the Spitkos.  Probably HSH would not be.

personal property:

| | |
|---|---|
| Cash | $80.00 |
| Commerce Bank Account | $600.00 |
| Furniture | $10,000.00 |
| Clothing | $1,000.00 |
| Jewelry | $1,300.00 |
| Equipment | $90.00 |
| Various IRA Accounts | $166,632.08 |
| Stock interests | |
| Value of Sentek | Unknown |
| Value of Maintech | $0.00 |
| Value of BTR | $0.00 |
| 1987 Mazda B2000 Pick-up Truck | $100.00 |
| 2003 Saturn Ion | $13,000.00 |
| Used equipment in storage trailers and at storage warehouse in MN | $6,000.00[9] |

Ex. P-11 at 10-12.

_____

[9]On the initial schedule B, the debtors failed to list any assets in storage.  Ex. P-10 at 2-4.
On the amended schedule, the storage location is implied as being in Minnesota rather than
Philadelphia.

34

95.  Wachovia Bank is listed on the amended schedules as holding a secured claim in the amount of $2,100,000 resulting from a business loan incurred on May 2001.  Ex. P-11 at 15.  It is also listed as holding an unsecured nonpriority claim in the amount of $3,563,148.17.  Id. at 20.

96.  The debtors did not list the Internal Revenue Service as a creditor on Schedule E of their bankruptcy petition.  Ex. P-10 at 8; Ex. P-11 at 16.

97.  On the debtors' initial Schedule F, the debtors listed numerous unsecured creditors that purportedly held claims against Maintech, and then state that they are not personally liable to these creditors for repayment.  See Ex. P-10 at 10-12.   After discussions with the trustee at the first meeting of creditors, the debtors agreed to list these creditors with the statement "Claim against Maintech, Inc.- Included for notice purpose only."  See Ex. P-11 at 17-20; 1 N.T. at 40-41; 3 N.T. at 28-29.

98.  On both their initial and amended schedule B, the Spitkos reveal only their Commerce Bank account.  Exs. P-10 at 2; P-11 at 10.  Undisclosed were several bank accounts titled either jointly or individually, including accounts at Willow Grove Bank, Wachovia Bank, Mellon Bank, First Republic Bank, and Artisans' Bank.  Ex. P-11 at 77, 97, 151, 156, 171, 180; 1 N.T. at 22, 46, 91, 168-69.  Carl Spitko conceded that he and his wife did not disclose all bank accounts that they had at the time of the filing.  1 N.T. at 37-38.  Moreover, in the year prior to bankruptcy, the Spitkos had an account with

South Trust Bank that was not revealed to the trustee.  See Ex. P-11 at 32-91, 93-111,

151-66, 168-84; Ex. D-19 at 001115.

     99.  Carl Spitko testified that the failure to reveal the Willow Grove Bank

account was an oversight.  2 N.T. at 200.  The Spitkos' amended statement of financial

affairs and schedules attached copies of various bank statements, including Willow

Grove's.   This amendment was made after the first meeting of creditors commenced on

October 5th, with a Wachovia representative probably present.

     100.  The debtors listed on both their initial and amended schedules that the

value of Maintech's stock was zero.  Ex. P-10 at 3; Ex. P-11 at 11; 1 N.T. at 22-23.  Carl

Sptiko testified that at the time of the filing he listed Maintech's value as zero "[b]ecause

at that point it was inactive and dormant, and I did not believe that there was any value at

that time." 1 N.T. at 22-23.  The value of the remaining assets of Maintech was less than

the amount of Wachovia's lien.  Carl Spitko's interest in BTR was also disclosed as

having no value because its assets had been sold prior to his bankruptcy filing.  2 N.T. at

185-86.

     101.  Elizabeth Spitko testified that the debtors' second mortgage with PNC

Bank probably occurred in 2002 or 2003.  Id. at 174-76.  The debtor's amended schedule

D states that this mortgage loan was consummated in September 2000.  Ex. P-11 at 14.

PNC has filed a proof of claim, docketed as claim #4, attaching documents asserting that

the mortgage loan was incurred in June 2002.[10]   It is likely that the date of the PNC

mortgage disclosed in the debtors' amended schedules is incorrect.

102.  The Spitkos valued their interest in Sentek on their schedules as

"unknown."  P-10 at 3; P-11 at 11; 3 N.T. at 55.

103.  Sentek's profit and loss statement covering the period of January 2003

to December 2004 indicates that it had total sales of over $2.1 million.  Ex. P-12 at 1.

However, after subtracting all of the expenses, Sentek purportedly had net income in the

amount of only $15,924.65.  Id. at 4; 1 N.T. at 118.

104.  Additionally, it is Carl Spitko who is the main revenue generator for

Sentek and its key employee.  It is not clear whether any value arises from the debtors'

interest in this company, in addition to the value of its tangible assets, independent of the

services of Carl Spitko.

105.  Prior to their bankruptcy filing, the Spitkos had reached a settlement

with De Lage Landen, a company from whom Maintech had leased equipment.  1 N.T. at

49.  The Spitkos had guaranteed Maintech's De Lage Landen obligation.  Id. at 26, 41.

The settlement required them to pay $3,000 per month.  Id. at 56.  Shortly before their

bankruptcy filing, the debtors had made payments on February 23, 2004 and June 3, 2004,

_____

[10]A bankruptcy court may take judicial notice, under Fed. R. Evid. 201, of the filing of a
proof of claim on its docket, and notice of the averments made therein, without reaching any
conclusion as to the allowance of that claim.  See, e.g., In re Vincente, 257 B.R. 168, 173 n.9
(Bankr. E.D. Pa. 2001); see also In re H.E. Graf, Inc., 125 B.R. 604, 606 (Bankr. E.D. Cal. 1991).

each of $3,000.  See Ex. P-11 at 43, 81; 1 N.T. at 55-56, 185-86.  The debtors did not

disclose their payment made to De Lage Landen within 90 days prior to their bankruptcy

filing, either on their original or amended schedules.  Exs. P-10 at 18; P-11 at 2, 25-29.

106.  Within one year prior to the debtors' bankruptcy filing, the debtors

had made 11 payments to various credit card companies.  See Ex. P-11 at 47, 49, 51-52,

62-64, 70, 74; 1 N.T. at 52-55.  The debtors did not list any payments to credit card

companies made within 90 days of their bankruptcy filing on their initial statement of

financial affairs.  Ex. P-10 at 18.  On their amended statement of financial affairs, they

did not specifically list any payments but instead made reference to their attached bank

statements.  Ex. P-11 at 2.  These payments included a Feb. 6, 2004 payment that the

debtors made to Citi Bank in the amount of $2,030.60.  Id. at 42; 1 N.T. at 48-49.

107.  The debtors did not include payments to credit card companies in their

schedule J spreadsheet because reflected in their bankruptcy schedules were several

expenses that were typically paid by credit card.  1 N.T. at 63.  Elizabeth Spitko testified

that various household expenses were paid using a credit card, including phone service,

clothing, laundry/dry cleaning, recreational expenses, and occasionally expenses for the

child care provider or pet care expenses.  Id. at 180-81.

108.  The debtors did not list on their schedule J, statement of expenses, any

payments to law firms for legal services.  Ex. P-11 at 24-29; 1 N.T. at 30, 43-44.

38

Elizabeth Spitko testified that she did not include legal fees on her schedule of expenses because it did not occur to her, as she assumed that schedule J involved only "daily living expenses." 1 N.T. at 163-64. The debtors did not include payments to Ken Cohen, another lawyer, who performed work for the debtors, as part of the amended schedule J, because it was not made within a year of their bankruptcy petition. 3 N.T. at 59-61.

109. In reference to the $100,000 worth of personal property listed in the debtors' 2002 personal financial statement provided to Wachovia, Carl Spitko testified that their personal property was unchanged as of the time of the bankruptcy filing, except for ownership of certain vehicles. 1 N.T. at 88.

110. The debtors have not sold any assets of value since 2002, nor have they gifted any item over $100 in the last two years. Id. at 172-73. Since 2003, they have purchased only a new gas grill and a laptop computer. Id. They have also acquired possession of a dining room set; but this furniture belongs to Elizabeth Spitko's family. 2 N.T. at 177-79.

111. On the debtor's bankruptcy schedules, they list the value of various types of personal property that they owned. Ex. P-11 at 10-12. This includes furniture valued at $10,000, $1,000 worth of clothing, $1,300 worth of jewelry, and $90 of equipment for a total of $12,390. Id.; 1 N.T. at 89. Additionally, the amended schedules disclose that the debtors owned $6,000 worth of business equipment in storage. Ex. P-11

at 12.

112.  The debtors acknowledged the difference between the value of their personal property as listed on their prepetition financial statement and their bankruptcy schedules.  1 N.T. at 89-90; 2 N.T. at 175-76.  However,  they reasonably explain this difference by stating that they used "replacement values" on their financial statement but "liquidation values" on their bankruptcy schedules.  1 N.T. at 89-90; 2 N.T. at 175-78; 3 N.T. at 52.

113.  In their 2001 financial statement, the debtors listed $65,000 worth of automobiles, and that number was reduced to $60,000 worth of automobiles in the 2002 financial statement.  Exs. P-19 at 2; P-20 at 2; 3 N.T. at 49-50.  When they filed both of these financial statements they owned the same automobiles: a Toyota Avalon, a Chrysler Sebring, a Honda Accord and a 1987 Mazda truck.  2 N.T. at 191-3.  At the time of the bankruptcy filing, however, they had sold the Avalon and the Accord and traded the Sebring for a Saturn.  Id.  They also had another vehicle which was leased.  Id. at 193, 198-99.  Carl Spitko testified that the net proceeds from the sales of the Avalon and the Sebring were modest.  Id. at 192-93.

114.  The debtors had the same IRAs and investments as in Exhibit P-20 and at the time of the bankruptcy filing.  Id. at 194-96.  On their bankruptcy schedules, they disclosed the value of various IRA accounts at $166,632.08.  Ex. P-11 at 10-12.

40

115.  The debtors owned laminators and other business equipment personally.  Id. at 68, 136.  Some laminators and equipment currently in storage are likely owned by the debtors rather than by Sentek or Maintech.  1 N.T. at 38.  The debtors owned equipment stored at Rentz Storage in Philadelphia, PA and some still remains there.  Id. at 39; 2 N.T. at 80-81.

116.  The debtors' amended schedule B lists under "Machinery, fixtures, equipment, and supplies used in business," "Used equipment in storage trucks and at storage warehouse in Minneapolis, MN."  Ex. P-11 at 12.  There is no mention of property listed at the Rentz Storage Facility.

117.  The debtors stated on both their initial and amended schedule B that they had $80 in "cash on hand" at the time of the bankruptcy filing.  Exs. P-10 at 2; P-11 at 10.  The debtors listed $600 in a Commerce Bank account at the time of the bankruptcy filing.  Exs. P-10 at 2; P-11 at 10.  The debtors state that they did not have any cash at home at the time of their bankruptcy filing.  1 N.T. at 195-96.

118.  A profit and loss statement, dated January 4, 2005, was produced for Sentek.  Ex. P-12; 1 N.T. at 63.  Sentek never produced any other financial statement since its operation began on June 6, 2003.  1 N.T. at 22.  This statement covers the period from June 2003 to December 2004.  Ex. P-12.

119.  On March 4, 2005, Carl Spitko opened a bank account at Abington

Bank for Maintech with $1,000 of his personal funds, almost two years after it ceased to

operate.  Ex. P-29; 1 N.T. at 101-02.  At the time, Carl Spitko described Maintech as

being "dormant" and that he opened the account because a prior account had been closed.

1 N.T. at 102.

120.  In May 2005, the trustee requested that the debtors turn over records

for Maintech and Sentek.  3 N.T. at 9.

121.  On May 27, 2005, Carl Spitko testified at a deposition that Maintech's

accounting was incomplete.  Ex. T-1; 3 N.T. at 80-82.

122.  On June 1, 2005, Carl Spitko, in response to an email from Egil

Percival, a potential customer, stated that "Sentek is a company that we established for

only the spare parts and servicing of Hakuto and Maintech laminators."  Ex. P-13 at 2; 1

N.T. at 68-69.  In another email sent on June 14, 2005 to the same individual, Carl Spitko

stated "Maintech is not in operation, but all intellectual property of Maintech is alive and

well, we are producing these laminators in Chengdu China with a partner there that is in

the aerospace industry."  Ex. P-13 at 1; 1 N.T. at 69.

123.  Carl Spitko hired a bookkeeper from AccountTemps to perform bank

reconciliation work for Maintech and Sentek in July of 2005.  1 N.T. at 17, 112-13; 2

N.T. at 209-10; 3 N.T. at 85.  Prior to that, he had not made any effort to hire an

accountant.  1 N.T. at 114; 3 N.T. at 54.  He stated that it was just "physically impossible"

to get the reconciliation done.  1 N.T. at 113-15.  The bookkeeper worked approximately

eight or nine days.  Id. at 113.  All of the records that AccountTemps used to perform the

bank reconciliation existed at the time of the bankruptcy filing.  3 N.T. at 54.

124.  In July of 2005, the debtors provided Kenneth LaFiandra, Esquire,

counsel for the trustee, with a digital copy of Maintech's and Sentek's records.  See Ex.

T-2; 1 N.T. at 115-16.  On July 22, 2005, Carl Spitko sent the trustee two letters and two

compact disks.  Ex. T-2; 3 N.T. at 92-93.  The first letter stated "[t]his is a copy of the

copy of [sic] what we have right now for Maintech, Inc. and BTR Enterprises.  Neither

one has had any reconciliation work done since early 2002.  They are not accurate but can

provide a picture of the current state of losses for 2002."  Ex. T-2 at 1.

125.  On July 22, 2005, Carl Spitko sent the trustee a second letter regarding

Sentek's electronic records.  Id. at 2.  It stated "[t]his is a copy of what we currently have

for Sentek, LLC.  We have had a bookkeeper in from Accountemps [sic] in an attempt to

get it current but I have included an A/R listing that highlights several areas that need to

be corrected.  Other areas of the accounting, such as prepaid expenses and A/P still need

work over the next week."  Id.; see 3 N.T. at 94.  Along with the electronic records on

CD, the debtors also provided the trustee with copies of the accounting software

programs on CD and the administrative passwords.  3 N.T. at 10.

126.  Carl Spitko testified in court as follows: "[A]t the – I believe it was in

43

July of 2005, we provided the most complete record in CD format to Mr. LaFiandra, the

Trustee's lawyer, for Maintech.  And we provided a very updated and reconciled copy of

the Sentech [sic] files.  We had Accountemps [sic] do our work, and they did get the work

done for Sentech [sic] prior to us turning over the CD.  But the Trustee did have the most

complete records that we had at the time."  3 N.T. at 9.  Neither the trustee nor any of his

representatives ever physically inspected Maintech's records prior to August 2005.  Id.

However, it is clear that the electronic documentation given to the trustee regarding the

records for Maintech, Sentek and BTR was not complete.  See Ex. T-2; 1 N.T. at 111-12,

115-17, 146.  There is, as Carl Spitko acknowledged, "a huge pile of paper" involving

these two corporations that still needs to be gone through and compared with other

documents.  1 N.T. at 116-17, 146-47.

      127.  Additionally, Carl Spitko concedes that the digital records were not

complete: "The copy of the electronic copy that I gave Mr. LaFiandra was not complete

because we could not complete that in time for the deposition.  I said at subsequent

moment I would give him the most updated copy that I possibly can.  We had Account

Temps come in, we did the work, I felt comfortable that it was as accurate as it was gonna

be at that time, and I planned on providing it to him but subsequent to that, there was

actions by the FBI and they removed my server.  So I was not able to give him  - - the

exact and more complete copy to Mr. LaFiandra."  Id. at 116.

44

128.  Maintech still maintains a bank account with about $100 in it.  2 N.T. at 208.  Carl Spitko has retained copies of all of Maintech's bank statements after it ceased operations.  Id. at 207; 3 N.T. at 7-8.  The debtors retained Maintech's bank statements and cancelled checks from 1998 to 1999 to the present either in boxes or in fireproof filing cabinets at Sentek's offices.  2 N.T. at 210; 3 N.T. at 7-8.  These records were stored together in a box at the Sentek facility.  2 N.T. at 208-10; 3 N.T. at 8.  Additionally, various Maintech records from 1993 to 2000 were stored on pallets in the Sentek warehouse.  3 N.T. at 7.

129.  Sentek's records including bank statements and cancelled checks were also stored at its offices.  Id. at 11.

130.  Exhibit D-19 contains numerous documents that were produced to the trustee after the debtor's bankruptcy filing.  Id. at 95.  Exhibit D-18 includes additional records that the debtors were asked to provide to the trustee after the meeting of creditors.  Ex. D-18; 3 N.T. at 44-45.  Included in both exhibits D-18 and D-19 are various records from Maintech and Sentek.

131.  Carl Spitko blames David Ellis as general manager for not making sure the employees entered transactions into Sentek's accounting system accurately.  3 N.T. at 82-85.  Mr. Ellis stated that he tried to stay on top of the bank reconciliation work for Sentek, but towards the end of his employment he was not able to.  2 N.T. at 88-89.

The debtors were the sole owners of both Maintech and Sentek.  Mr. Spitko was

significantly involved in the day to day operations of these two companies.  The Spitkos

were responsible for the insuring the completeness of corporate records.

132.  Carl Spitko holds a bachelor's of science degree in engineering from

the University of Delaware and also masters' degree in engineering.  1 N.T. at 141.

Elizabeth Spitko has bachelor's of science degree in nursing and a master's degree in

nursing.  Id. at 158.

133.  Carl Spitko testified that he and his wife kept whatever personal

records that they could.  "We kept every record that we possibly could, for IRAs, bank

account statements, stock brokerage accounts, bills paid.  We have checkbook register,

just a hand-written checkbook register.  But every possible transaction that we ever made,

we kept records of those transactions."  3 N.T. at 14.  Some bank statements they did not

produce, because they could not obtain them from Mellon Bank.  Id. at 14-15.  However,

the debtors did not keep a record of the source of the deposits into their various bank

accounts.  1 N.T. at 183.  Nor, as mentioned above, did they retain detailed records

regarding their prepetition cash transactions within one year of their bankruptcy filing.

134.  There is no evidence that the debtors affirmatively destroyed

Maintech, Sentek, or their personal financial records in the last three years.  Nonetheless,

the financial records in the debtors' possession were incomplete, limiting the trustee's

ability to determine the value and location of all assets.  <u>See</u> 3 N.T. at 47.

II.

1.  The debtors' chapter 7 discharge should be denied pursuant to 11 U.S.C. § 727(a)(2)(A), because they transferred and/or concealed their property with the intent to hinder, delay, or defraud at least one of their creditors within one year of the bankruptcy filing.

2.  Maintech and Sentek's business records would be highly relevant to understanding the debtors' financial circumstances at the time they filed their chapter 7 bankruptcy petition.  Those records are incomplete, as are the debtor's personal financial records.  As such, the debtors failed to adequately keep and preserve records and should be denied a discharge under 11 U.S.C. § 727(a)(3).

4.  The debtors made a false oath on their bankruptcy schedules and statement of financial affairs, thus requiring denial of a chapter 7 discharge under section 727(a)(4).

5.  The debtors provided a sufficient explanation as to the disposition of their assets so that the plaintiffs' requested relief under section 727(a)(5) should be denied.

47

III.

Pursuant to section 727(a), an individual debtor will be granted a discharge
in bankruptcy unless one of the specified exceptions applies.  Courts have generally
recognized that denial of a debtor's discharge is a harsh sanction.  See In re Gioioso, 979
F.2d 956, 962 (3d Cir. 1992); In re Gudowitz, 1986 WL 28906, at *3 (Bankr. S.D.N.Y.
1986).  Accordingly, "[c]onsistent with the 'fresh start' policy underlying the Code, these
exceptions to discharge should be construed strictly against the creditor and liberally in
favor of the debtor."  Matter of Juzwiak, 89 F.3d 424, 427 (7th Cir. 1996); Rosen v.
Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993) ("Completely denying a debtor his discharge,
as opposed to avoiding a transfer or declining to discharge an individual debt pursuant to
§ 523, is an extreme step and should not be taken lightly."); In re Adeeb, 787 F.2d 1339,
1342 (9th Cir. 1986).

Nevertheless, courts have also acknowledged that, "a discharge in
bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest
debtor."  E.g., Matter of Juzwiak, 89 F.3d at 427.  Thus, where a debtor has been
dishonest in his dealings with the court or his creditors, it may be appropriate to deny his
discharge, notwithstanding that an underlying goal of federal bankruptcy law is to provide
a debtor with a fresh start.  "While the law favors discharges in bankruptcy, it will not

48

ordinarily tolerate the [debtor's] intentional departure from honest business practices where there is a reasonable likelihood of prejudice." Kentile Floors, Inc. v. Winham, 440 F.2d 1128, 1131 (9th Cir. 1971).

In these consolidated adversary proceedings, Wachovia and Howard Glassman, Esquire, the chapter 7 trustee, have raised four grounds for denying the debtors their bankruptcy discharge: sections 727(a)(2)(A), (a)(3), (a)(4)(A) and (a)(5).[11] The plaintiffs have the burden to prove their objections to discharge by a preponderance of the evidence. See, e.g., In re Adams, 31 F.3d 389, 393-94 (6th Cir. 1994); In re Sterman, 244 B.R. 499, 504 (D. Mass. 1999); In re Dolata, 306 B.R. 97, 146 (Bankr. W.D. Pa. 2004).

In their post-trial submissions, the plaintiffs address their objections in numerical order, and so shall I.


A.


According to section 727(a)(2)(A), a debtor will be denied a discharge where he or she

with intent to hinder, delay, or defraud a creditor or an officer

---

[11]In his post-trial memorandum, the trustee also refers to section 727(a)(7).  Not only was this not raised in his complaint, but this subsection would only be relevant if Maintech or Sentek had filed a bankruptcy petition.  As neither corporation had done so as of the date of trial (Sentek only recently filed for bankruptcy), this provision is inapplicable.

> of the estate charged with custody of property under this title,
> has transferred, removed, destroyed, mutilated, or concealed,
> or has permitted to be transferred, removed, destroyed,
> mutilated, or concealed–
>
> (A) property of the debtor, within one year before the date of
> the filing of the petition;

See generally Rosen v. Bezner, 996 F.2d at 1531; Chusid v. First Union National Bank,

1998 WL 42292, at *8 (E.D. Pa. 1998); Scimeca v. Umanoff, 169 B.R. 536, 539 (D.N.J.

1993), aff'd, 30 F.3d 1488 (3d Cir. 1994) (Table).

Thus, to obtain relief under section 727(a)(2)(A), a plaintiff must establish

three elements: (1) a disposition of property, such as a transfer or concealment; (2) a

subjective intent on the debtor's part to hinder, delay or defraud one or more creditors or

the bankruptcy trustee through that disposition; and (3) that both the disposition and

subjective intent occurred within the one-year period before the petition was filed.  In re

Lawson, 122 F.3d 1237, 1240 (9th Cir. 1997); see Rosen v. Bezner, 996 F.2d at 1531.  As

noted above, the plaintiff bears the burden of proving these three requirements by a

preponderance of the evidence.  See, e.g., In re Kisberg, 150 B.R. 354, 357 (Bankr. M.D.

Pa. 1992).

According to the plain language of the statute, there must be a disposition

of "property of the debtor."  Relying on this language, courts have recognized that section

727(a)(2)(A) is concerned with the disposition of property in which the debtor has a

"direct proprietary interest." In re Thurman, 901 F.2d 839, 841 (10th Cir. 1990); In re

Cassis, 220 B.R. 979, 983 (Bankr. N.D. Iowa 1998); Matter of Woodhead, 172 B.R. 628,

632 (Bankr. D. Neb. 1994).  Therefore, section 727(a)(2)(A) does not apply when the

disposition involves property belonging to someone, or some entity, other than the debtor,

even if the transfer may cause an incidental effect upon the debtor's assets.  See In re

Thurman, 901 F.2d at 841.

When a corporation is a bona fide entity distinct from an individual debtor-

shareholder, courts have applied the above-stated principle to hold that transfers of

property belonging to the corporation are outside the scope of section 727(a)(2)(A).  See

In re Thurman, 901 F.2d at 841; In re Cassis, 220 B.R. at 983-84; In the Matter of

Myrick, 172 B.R. 633, 637-8 (Bankr. D. Neb. 1994); Matter of Woodhead, 172 B.R. at

633 ("[Section] 727(a)(2)(A) does not apply to the transfer of the assets of a corporation

in which the debtor is a shareholder.  [It] applies only to transfers of property in which the

debtor possesses a direct proprietary interest, and does not extend to derivative interests

of the debtor in his corporation's assets."); In re Srour, 138 B.R. 413, 420 (Bankr.

S.D.N.Y. 1992).  For example, in In re Cassis, the court stated that:

> A debtor who is a shareholder in a corporation will not be
> denied a discharge based on transfer of or injury to corporate
> property.  The plaintiff has the burden to establish that the
> property is property of the estate.  It is not because the
> debtor/shareholder is not the owner of property of the
> corporation.  The property interest of the debtor and the

51

> debtor's estate is limited to the stock certificates.
>
> Most courts considering whether a transfer of corporate property supports denial of discharge in an individual debtor's case have concluded it does not.  Even though a debtor may have caused a corporation to fraudulently transfer assets, that conduct does not support denial of discharge because the debtor has not transferred his own property.

In re Cassis, 220 B.R. at 983-84 (internal citations omitted).

In these proceedings there was considerable evidence that Maintech assets were transferred to Sentek in order to prevent those assets from being recovered by Wachovia.  If Maintech is a bona fide corporation, those transfers would fall outside the provisions of section 727(a)(2)(A).  Therefore, the plaintiffs contend that Maintech should be viewed as the debtors' alter ego, see generally In re Diloreto, slip op., C.A. No. 04-1326 (E.D. Pa., Oct. 13, 2006), while the debtors argue to the contrary.

In addition, for section 727(a)(2)(A) to apply, the improper transfer or concealment must occur within the one-year period preceding the filing of the debtor's bankruptcy petition.   However, under the notion of a continuous concealment, a debtor will be denied a discharge even if he initially concealed property before the one-year pre-bankruptcy period began where the concealment and requisite intent to defraud continued into that one-year period.  See, e.g., Rosen v. Bezner, 996 F.2d at 1532-33 ("Under the continuing concealment doctrine, a concealment initiated prior to the one year period, but continuing into that period, will fulfill the act requirement.  However, the party objecting

to discharge must still prove an improper subjective intent during the year before

bankruptcy in order to succeed."); see also In re Keeney, 227 F.3d 679, 684 (6th Cir.

2000); Hughes v. Lawson, 122 F.3d 1237, 1240-41 (9th Cir. 1997); In re Olivier, 819

F.2d 550, 553-54 (5th Cir. 1987).

       The concept of a transfer of property intended to hinder or delay or defraud

a creditor within one year of a bankruptcy filing also represents a fraudulent conveyance

under section 548(a)(1)(A).  Thus, one commentator has described section 727(a)(2)(A)

as denying a bankruptcy discharge to a debtor who is "guilty of a major-league fraudulent

conveyance within one year prior to the filing of the petition."  2 Eptsein, et al.,

Bankruptcy, § 7-19 at 316 (1992).  However, in addition to denying a discharge for the

improper transfer of a debtor's property, the express language of section 727(a)(2)(A)

also provides for such relief where a debtor concealed his property with improper intent.

As with outright transfers of property, for a debtor to be denied a discharge for fraudulent

concealment, the property allegedly concealed must be property of the debtor.  See Rosen

v. Bezner, 996 F.2d at 1531 ("Under § 727(a), a relevant concealment can occur only if

property of the debtor is concealed.  Thus, it is clear from the language of the statute that

the debtor must possess some property interest in order to be barred from discharge on the

grounds of a 'continuing concealment.'") (emphasis in original); In re Reader, 183 B.R.

630, 634 (Bankr. D. Idaho 1995).

For example, a fraudulent concealment may arise when a debtor ostensibly transfers his property to a third party, but retains either control over or a beneficial interest in the transferred property.  See In re Lawson, 122 F.3d at 1241; In re Olivier, 819 F.2d 550, 553 (5th Cir. 1987); In re Portnoy, 201 B.R. 685, 694 (Bankr. S.D.N.Y. 1996); In re McFarland, 170 B.R. 613, 629 (Bankr. S.D. Ohio 1994).  As explained by the Third Circuit Court of Appeals:

> Under the "continuous concealment" doctrine, a concealment will be found to exist during the year before bankruptcy even if the initial act of concealment took place before this one year period as long as the debtor allowed the property to remain concealed into the critical year.  This doctrine does not negate the "act" requirement of § 727 but merely recognizes that a failure to reveal property previously concealed can, in some circumstances, properly be considered culpable conduct during the year before bankruptcy warranting a denial of discharge. . . .

> [T]he concealment is present . . . because the transfer of title represents to the world that the debtor has transferred away all his interest in the property while in reality he has retained some secret interest—a secret interest of which retention of the benefits of ownership may be evidence.  A legally relevant concealment can exist, however, only if there is, in fact, some secret interest in the property retained by the debtor.

Rosen v. Bezner, 996 F.2d at 1531-32 (footnote omitted).

Finally, for a debtor to be denied a discharge under § 727(a)(2), the plaintiff must demonstrate that the debtor either transferred or concealed property with the subjective intent to defraud his creditors.  E.g., In re Lawson, 122 F.3d at 1240.  The

54

intent element does not require that the debtor actually defrauded or harmed his creditors; in fact, lack of injury to creditors is irrelevant.  See In re Adeeb, 787 F.2d at 1343; In re Boba, 280 B.R. 430, 435 (Bankr. N.D. Ill. 2002) ("Debtor's suggestion that Creditor was not harmed by his actions is of no moment, since § 727(a)(2)(A) does not require that the creditor suffer actual harm for the debtor to be denied the privilege of discharge.  Creditor merely has to show by a preponderance of evidence under that provision that Debtor intended to defraud it.") (citation omitted).

A plaintiff objecting to discharge under section 727(a)(2) must prove that the debtor had an actual intent to defraud.  In re Adeeb, 787 F.3d at 1342; In re More, 138 B.R. 102, 104 (Bankr. M.D. Fla. 1992).  However, because courts recognize that a debtor will be reluctant to admit that he was motivated by fraud, they have permitted fraudulent intent to be inferred from circumstantial evidence or a course of conduct.  See In re Olivier, 819 F.2d at 553; In re Adeeb, 787 F.2d at 1343; Matter of Hughes, 184 B.R. 902, 908 (Bankr. E.D. La. 1995).  Moreover, there is no time restraint on the evidence that may be considered by a court.  It is not required to consider only events that took place within the one-year prepetition period in determining intent.  See, e.g., Future Time, Inc. v. Yates, 26 B.R. 1006, 1008 (M.D. Ga. 1983), aff'd, 712 F.2d 1417 (11th Cir. 1983) (Table).

Courts have articulated some generalities concerning the circumstantial

evidence from which fraud may be inferred.  For example, fraudulent intent may be found

where a transfer is gratuitous or made to the debtor's relative.  See Matter of Chastant,

873 F.2d 89, 91 (5th Cir. 1989); In re Lang, 246 B.R. 463, 470 (Bankr. D. Mass. 2000); In

re Kablaoui, 196 B.R. 705, 710 (Bankr. S.D.N.Y. 1996).  In addition, courts have

established "badges of fraud" that "strongly suggest that a transaction's purpose is to

defraud creditors unless some other convincing explanation appears."  In re Woodfield,

978 F.2d 516, 518 (9th Cir. 1992).  These badges include:

> (1) a close relationship between the transferor and the
> transferee; (2) that the transfer was in anticipation of a
> pending suit; (3) that the transferor Debtor was insolvent or in
> poor financial condition at the time; (4) that all or
> substantially all of the Debtor's property was transferred; (5)
> that the transfer so completely depleted the Debtor's assets
> that the creditor has been hindered or delayed in recovering
> any part of the judgment; and (6) that the Debtor received
> inadequate consideration for the transfer.

Id. at 518; Matter of Chastant, 873 F.2d at 91; In re More, 138 B.R. at 105; see also

Matter of Hughes, 184 B.R. at 908 ("The retention of the use of transferred property very

strongly indicates a fraudulent motive underlying the transfer.").

    The Second Circuit Court of Appeals in the case of In re Kaiser addressed

the situation where the debtor transferred assets to a wholly owned corporation prior to

the bankruptcy.  722 F.2d 1574, 1583 (2d Cir. 1983).  This court stated "[t]he shifting of

assets by the debtor to a corporation wholly controlled by him is another badge of fraud . .

56

. . He [the debtor] created dummy corporations in order to hide his assets.  He concealed

these assets in his petition for bankruptcy.  This scenario clearly indicates a scheme to

defraud creditors."  Id. at 1583.

Since actual fraud may be inferred from circumstantial evidence and the

debtors' course of conduct, a court should consider the totality of the evidence to

determine whether transfers and concealments were done with an intent to deceive the

debtors' creditors.  Since there is no time constraint on the evidence that the court may

consider on this issue, I shall evaluate all of the evidence in the record, notwithstanding

when the transactions took place.  See Future Time, Inc. v. Yates, 26 B.R. at 1008.


B.


Wachovia and the trustee complain about many transfers (i.e., payments)

made by the Spitkos prior to their bankruptcy filing.  They focus primarily on the

payments made to John Spitko, HSH, David Ellis, and Sentek within one year of the

debtors' bankruptcy filing as transfers intended to hinder or defraud Wachovia.  They also

emphasize the debtors' placement of large cash sums at home, opening of a Delaware

bank account for deposit of their tax refund, and storage of personal and corporate assets

in trailers as attempts of concealment.   And, as mentioned earlier, the plaintiffs contend

that Maintech and Sentek were really the alter egos of the debtors so that Maintech's

transfer of assets would also justify denial of the Spitkos' discharge under section

727(a)(2)(A).

The Spitkos respond that some of the complained of payments were outside

the one-year reachback period, and that it was not fraudulent to incorporate Sentek in

order to preserve Carl Spitko's employment or to open a bank account in Delaware to

prevent execution by Wachovia.  They further maintain that John Spitko was owed a debt

and thus entitled to repayment, and that their cash expenditures actually occurred and

involved only legitimate expenses.

Upon my review of the evidence, I conclude that the plaintiffs did not meet

their evidentiary burden under section 727(a)(2)(A) with regard to the debtors' payments

to John Spitko and HSH.  Even if John Spitko did not hold a valid mortgage on the

debtors' realty, there was sufficient evidence that he held a debt in excess of the amounts

paid to him, including the February 2003 payment that Carl Spitko unpersuasively

represented as involving a 1986 obligation.[12]

Similarly, the evidence supports the debtors' contention that HSH provided

actual legal services involving either the Spitkos or involving loans for which they were

guarantors.

_____

[12]The mortgage recordation issue is addressed below in my analysis of section 727(a)(4).

58

For purposes of section 727(a)(2) only, I also conclude that there was insufficient evidence to demonstrate that Sentek and/or Maintech were alter ego corporations of the debtors.  See In re Blatstein, 192 F.3d 88, 101 (3d Cir. 1999). Maintech was in existence since 1988, had many employees over the years and built up a business sufficiently viable to obtain considerable bank financing about twelve years later.  Until around 2002, its business records were complete.  There was no evidence that corporate formalities were not followed.  Thus, Maintech was not proven to be Carl Spitko's alter ego.

Sentek involves a closer question, but the plaintiffs offered little evidence on this issue.  The evidence that was presented seemed focused upon Sentek as Maintech's successor, and not as the alter ego of the Spitkos.  Moreover, there was no evidence that Sentek transferred or concealed its property within one year of the bankruptcy filing.

Conversely, the plaintiffs demonstrated ample evidence, both circumstantial and from the testimony of the Spitkos, that the debtors' prepetition cash transactions, use of a Delaware bank account, formation of Sentek, use of Maintech assets on behalf of Sentek, and use of David Ellis to pay certain expenses, were intended by them to hinder and delay Wachovia's execution upon the debtors' and Maintech's assets.  See id., at 97 ("Similarly, the courts apply the bankruptcy code's denial of discharge provision, 11

U.S.C. § 727(a)(2)(A), to 'require[ ] only that the debtor make the transfer with intent to hinder, delay, or defraud 'a creditor.'  There is no requirement that the debtor intend to hinder all of his creditors.'") (quoting Adeeb, 787 F.2d at 1343).

In addition, the evidence supports the plaintiffs' position that Sentek was the successor to Maintech, designed to operate without the encumbrance of Maintech's debts and liens.  Sentek began operations on the first business day after Maintech ceased, with Maintech's employees, using Maintech's assets and servicing some of Maintech's customers.  Furthermore, Carl Spitko represented in an e-mail message to a potential customer the interrelationship between the two entities.

On May 12, 2003, the debtors received a tax refund of more than $374,000.  This was clearly their property.  On May 15, 2003, Wachovia confessed judgment against them for more than $3 million, rendering the debtors insolvent.  On May 22, 2003, the debtors opened a bank account at Artisans' Bank and deposited the entire tax refund into that account.  This bank was chosen to reduce the likelihood that Wachovia would discover the existence of this account.

On June 9, 2003, Sentek began its operations using Maintech's employees and assets, and dealing with some of its customers.  While its operations were not as extensive as Maintech's had been over the years, they likely were identical or similar to Maintech's reduced operations as of June 6, 2003.  The debtors filed their bankruptcy

petition on June 29, 2004.  In early June 2003, they transferred $61,600 of their property

to Sentek.  Beginning on July 1, 2003—within one year of their bankruptcy filing—the

Spitkos transferred additional sums to Sentek.  Between July 1 and July 29, 2003, they

transferred at least $51,500 in cash all derived from their tax refund.  These July

payments to Sentek, while purporting on the checks to be corporate loans, do not so

appear on the debtors' bankruptcy schedules and were not represented to be loans by Carl

Spitko in his testimony.

Almost a century ago, the Second Circuit Court of Appeals observed, in

applying an ancestor of section 727(a)(2)(A), "that the effect to be given to the

organization of a corporation by persons in failing circumstances who transfer their

property to it depends upon the intent with which the parties acted[.]"  In re Braus, 248 F.

55, 59 (2d Cir. 1917).

Here, the evidence demonstrated that Sentek was formed to defeat the

security interest held by Wachovia in Maintech's assets, as well as preclude execution on

the judgments against the Spitkos and Maintech.  While some of Maintech's assets (and

those of BTR) were repaid to Wachovia, other assets of Maintech, both tangible and

intangible, were improperly used by the debtors to operate Sentek without fair

compensation paid to Maintech.  The preponderance of the evidence supports the

conclusion that the formation and operation of Sentek was undertaken by the debtors to

hinder, delay and/or defraud Wachovia, one of their creditors. And the Spitkos' transfer

to Sentek of at least $51,500 of personal property within one year of bankruptcy was

made to further that improper scheme. Therefore, all three elements of section

727(a)(2)(A)—transfer of the debtors' property within one year of the bankruptcy filing

with intent to hinder, delay or defraud at least one creditor—have been proven by a

preponderance of the evidence. See In re Perry, 252 B.R. 541, 547-48 (Bankr. M.D. Fla.

2000) (denial of discharge under section 727(a)(2)(A) was warranted where debtor

"jockey[ed] funds between family-run business entities to avoid such funds being levied

by his creditors"); In re Balch, 25 B.R. 22 (Bankr. N.D. Tex. 1982) (section 727(a)(2)(A)

applied when the debtor created a corporation "to enable him to continue to make a living

and to prevent the attachment of his assets by judgment creditors," with corporate stock in

the name of his wife); cf. In re Main, Inc., 1999 WL 689715, at *20 (E.D. Pa. 1999)

(individual debtor was properly denied a chapter 7 discharge under section 727(a)(2)(A)

and (a)(7) when evidence demonstrated that he had transferred assets from a corporate-

debtor to another corporation with the intent to hinder, delay and/or defraud creditors).

    I further find that the Spitkos actually concealed certain of their assets, as

well as Maintech's assets, in storage trailers, which concealment continued within one

year of their bankruptcy filing. It is unlikely that Wachovia's appraiser agent would be

uninterested in those assets; thus, I find unpersuasive Carl Spitkos' suggestion that the

agent was informed of their location.  Moreover, David Ellis was utilized to make some

of the storage payments, using funds secretly provided by the debtors, to further make the

discovery of these hidden assets less likely.   This supports the conclusion that the

storage of assets was undertaken with a subjective intent to hinder, defraud or delay

Wachovia.

Further, the Spitkos concealed cash at home when Elizabeth Spitko denied

having any cash during a prepetition deposition in aid of execution in October 2003.

Compare In re Pratt, 411 F.3d 561, 567-68 (5th Cir. 2005) (debtor admits during

deposition to having considerable cash at home).

Having thus concluded that the evidence supports a denial of discharge

under section 727(a)(2)(A), I need not address any further issues, as the plaintiffs can

obtain no additional relief on their remaining three counts under section 727(a).  See, e.g.,

Matter of Beaubouef, 966 F.2d 174, 177 (5th Cir. 1992).  Nonetheless, in the interest of

completeness, and to aid in any appellate review, I shall also determine the remaining

three counts.  See In re Diloreto; cf. Edwards v. Wyatt, 335 F.3d 261, 277 (3d Cir. 2003)

(holding that a failure to consider an alternative claim necessitated a remand to the trial

court where the ruling on the primary claim was erroneous).

IV.

The plaintiffs request that the debtors also be denied their discharge under §

727(a)(3), which provides for such denial when:

> [T]he debtor has concealed, destroyed, mutilated, falsified, or
> failed to keep or preserve any recorded information, including
> books, documents, records, and papers, from which the
> debtor's financial condition or business transactions might be
> ascertained unless such act or failure to act was justified
> under all of the circumstances of the case;

As explained by the Third Circuit Court of Appeals:

> The purpose of [this provision] is to give creditors and the
> bankruptcy court complete and accurate information
> concerning the status of the debtor's affairs and to test the
> completeness of the disclosure requisite to a discharge.  The
> statute also ensures that the trustee and creditors are supplied
> with dependable information on which they can rely in tracing
> a debtor's financial history.  Creditors are not required to risk
> having the debtor withhold or conceal assets under cover of a
> chaotic or incomplete set of books or records.

Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir. 1992) (internal citation and

quotations omitted); see also In re Scott, 172 F.3d 959, 969 (7th Cir. 1999); In re Cox,

904 F.2d 1399, 1401 (9th Cir. 1990); In re Kearns, 149 B.R. 189, 190 (Bankr. D. Kan.

1992); In re Gudowitz 1986 WL 28906, at *4-5.

To qualify for relief, the plaintiffs must show "(1) that the debtor failed to

maintain and preserve records, and (2) that such failure makes it impossible to ascertain

64

the debtor's financial condition and material business transactions." Meridian Bank v.

Alten, 958 F.2d at 1233.  The creditor need not prove that the debtor had an intent to

defraud.  See Matter of Juzwiak, 89 F.3d at 430 ("Although the ultimate goal of §

727(a)(3) is to distinguish between the honest debtor, who should be granted the privilege

of discharge, and the abusive or unworthy debtor, who does not deserve such a benefit,

creditors do not need to prove that the debtor intended to defraud them in order to

demonstrate a § 727(a)(3) violation.") (citation omitted); In re Senese, 245 B.R. 565, 576

(Bankr. N.D. Ill. 2000).

   "What constituted sufficient record keeping varied with the facts of each

case, but in all cases, complete disclosure was required." Meridian Bank v. Alten, 958

F.2d at 1230.  This means that the debtors must provide sufficient written evidence from

which "the present financial condition of the bankrupt, and his business transactions for a

reasonable period in the past may be ascertained." Id.; see also In re Scott, 172 F.3d at

970; Matter of Juzwiak, 89 F.3d at 427-28; Chusid v. First Union National Bank, 1998

WL 42292, at *6; In re Ross, 1999 WL 10019, at *5 (Bankr. E.D. Pa. 1999).  The debtors

cannot require the trustee or their creditors to reconstruct their business affairs.  As

explained by one court:

> [C]reditors are not required to sift through documents and
> attempt to reconstruct the flow of the debtor's assets.
> Similarly, the bankruptcy court in this case held that the
> trustee would have to reconstruct the financial condition of

> the [debtors] and their business entities, despite . . . testimony
> that it would be a Herculean effort to do so. . . . [T]he trustee
> does not have the obligation to undertake this.

In re Scott, 172 F.3d at 969-70 (internal citations and quotations omitted); see also Matter

of Juzwiak, 89 F.3d at 428 ("[C]ourts and creditors should not be required to speculate as

to the financial history or condition of the debtor, nor should they be compelled to

reconstruct the debtor's affairs.").

However, since an inquiry under § 727(a)(3) is fact specific, there is no

uniform manner in which records must be maintained.  See Matter of Juzwiak, 89 F.3d at

428 ("Records need not be kept in any special manner, nor is there any rigid standard of

perfection in record-keeping mandated by § 727(a)(3)."). Rather, as the Third Circuit has

recognized, the standard is one of reasonableness:

> The law is not unqualified in imposing a requirement to keep
> books or records and it does not require that if they are kept
> they shall be kept in any special form of accounts.  It is a
> question in each instance of reasonableness in the particular
> circumstances.  Complete disclosure is in every case a
> condition precedent to the granting of the discharge, and if
> such a disclosure is not possible without the keeping of books
> or records, then the absence of such amounts to that failure to
> which the act applies.

Meridian Bank v. Alten, 958 F.2d at 1230.

Once the plaintiff proves that the records produced are insufficient, the

burden shifts to the debtor to show that the deficiency is justified.  See Meridian Bank v.

Alten, 958 F.2d at 1233; Chusid v. First Union National Bank, 1998 WL 42292, at *6.

When determining whether there is justification, the Third Circuit has instructed, as

follows:

> The issue of justification depends largely on what a normal,
> reasonable person would do under similar circumstances.  The
> inquiry should include the education, experience, and
> sophistication of the debtor; the volume of the debtor's
> business; the complexity of the debtor's business; the amount
> of credit extended to debtor in his business; and any other
> circumstances that should be considered in the interest of
> justice.  Depending upon the sophistication of the debtor and
> the extent of his activities, different record keeping practices
> are necessary.  As an experienced attorney, [the debtor] is not
> an unsophisticated wage earner.  He is a knowledgeable
> business and professional person who knew the value of
> maintaining adequate records.  He generated substantial
> revenue and traveled extensively throughout the world, and
> was in the international investment and real estate consulting
> business for many years preceding [his] bankruptcy.

Meridian Bank v. Alten, 958 F.2d at 1231.

Where the debtor is engaged in numerous business transactions (as is the

instance here), the failure to keep or produce any records regarding those transactions

may be treated as a violation of § 727(a)(3).  See, e.g., In re Cox, 904 F.2d at 1402;

Chusid v. First Union National Bank, 1998 WL 42292, at *6 (denying discharge where

"[d]espite [the debtor's] level of [business] sophistication and numerous discovery

requests and court orders, the debtor has not produced any documentation substantiating

the loss of millions of dollars in assets").  The debtor cannot rely solely on

67

"unsubstantiated oral testimony" regarding his business dealings to satisfy his record-keeping requirement.  Matter of Juzwiak, 89 F.3d at 429; In re Kearns, 149 B.R. at 191.

Where, however, the debtor's records exist but are inadequate, at least one court considered the possibility that the debtor may supplement the available documents, and so cure any inadequacy, with thorough, credible testimony:

> In addition to the Debtor's failures in record keeping, he also provided little or no testimony which might have provided his creditors with information which would have been the equivalent of that information which his records and papers would have revealed, had they existed.  Instead, he repeatedly resorted to an absence of recollection when being questioned by Plaintiff's attorney at the Rule 2004 examination regarding his financial affairs and transactions relevant to these proceedings.

In re Senese, 245 B.R. at 576.  In general, a higher standard of record-keeping will be imposed upon chapter 7 debtors who are sophisticated business persons.  See Meridian Bank v. Alten, 958 F.2d at 1231; Chusid v. First Union National Bank, 1998 WL 42292, at *6.  Moreover, "section 727(a)(3)'s complete disclosure requirement extends beyond the property of the estate to include all 'business transactions' which shed light on the financial condition of the debtor."  Office of Comptroller General of Republic of Bolivia on behalf of Bolivian Air Force v. Tractman, 107 B.R. 24, 27 (S.D.N.Y. 1989); In re Braidis, 27 B.R. 470, 473 (Bankr. E.D. Pa. 1983); see also In re Ross, 1999 WL 10019, at *4:

68

> [U]nder appropriate circumstances a debtor may be denied a
> discharge based on his failure to keep, maintain or preserve
> records belonging to a separate, but closely held corporate
> entity.  The facts of each situation must be analyzed with the
> language and statutory purpose of § 727(a)(3) in mind.  That
> provision requires a debtor to keep or preserve "any" record
> from which the debtor's financial condition or business
> transactions might be ascertained. . . .  The statute is not by its
> terms limited to records belonging only to debtors or that are
> property of the estate, but instead the mandate subsumes all
> records relating to a debtor's financial affairs.

The plaintiffs herein contend that the debtors failed to preserve material

financial records, thus making it difficult to properly determine their financial condition.

Specifically, they complain about the lack of income tax returns for the debtors for three

years and their failure to maintain records of their extensive prepetition cash transaction.

They also assert that the failure of Maintech and Sentek to have prepared and filed tax

returns or even complete financial records, including records of their transactions inter se,

also warrants denial of discharge.

Of course, neither Sentek nor Maintech are the debtors in this bankruptcy

case.  Although section 727(a)(3) does not expressly state that only the personal records

of the debtor can serve as a basis for denying a discharge, some courts have determined

that the failure of an individual to preserve non-debtor corporate records can fall outside

the scope of section 727(a)(3).  See, e.g., United Diesel, Inc. v. Rodrigue, 98 B.R. 267,

270 (E.D. La. 1989); In re Hobbs, 333 B.R. 751, 757 (Bankr. N.D. Tex. 2005); In re

<u>Summers</u>, 320 B.R. 630, 638 (Bankr. E.D. Mich. 2005); <u>In re Jackson</u>, 2004 WL

2595900, at *6 (Bankr. D.N.H. 2004); <u>In re Espino</u>, 48 B.R. 232, 235 (Bankr. S.D. Fla.

1985), <u>aff'd</u>, 806 F.2d 1001 (11th Cir. 1986).

      However, other courts have concluded that the preservation of corporate

records can be germane to denial of discharge in those instances where the financial

condition of the individual debtor and the corporation are closely connected:

> Debtors were the sole owners of the corporation, the sole
> parties responsible for the decision-making and the financial
> affairs of the business, and solely responsible for the books
> and records of the business.  Without [the corporation]'s
> business records, no effort to ascertain Debtors' financial
> condition or relevant business transactions could be
> reasonably expected to succeed.  This Court agrees with <u>Ross</u>
> that, in situations where the facts indicate that a debtor
> exercised control over and conducted business through a
> closely held corporation, § 727(a)(3) inquiries cannot be
> artificially limited to those records that are, strictly speaking,
> those of the debtors.

<u>In re Thomas</u>, 2003 WL 21981707, at *11 (Bankr. D. Idaho 2003); <u>see</u> <u>In re Ross</u>, 1999

WL 10019, at *4; <u>In the Matter of Watson</u>, 122 B.R. 476, 481 (Bankr. M.D. Ga. 1990).

      For reasons noted above, the evidence does not support viewing Maintech

and Sentek as the debtors' alter egos.[13]  Nevertheless, the financial records of these two

---

[13]The necessity to preserve corporate records would be clear if the debtor and non-debtor
corporations were alter egos.  <u>See generally</u> <u>In re Daily</u>, 940 F.2d 1306 (9th Cir. 1991) (trustee
sought to recover funds held by corporations as being alter egos of the chapter 7 debtor); <u>In re
Towe</u>, 195 B.R. 137 (D. Mont. 1996) (same).

entities are relevant to this objection to discharge.  See In re Thomas, 2003 WL

21981707, at *11 (records of a closely held corporation solely owned by the debtors were

material under section 727(a)(3)).  The debtors' income and assets were largely derived

from these two corporations.

Carl Spitko was the sole shareholder of Maintech; the Spitkos were the sole

members of Sentek.  Sentek clearly was an operating entity at the time of the debtors'

bankruptcy filing purporting to have gross income of more than $2 million annually.

Maintech probably had outstanding receivables, personal property, and at least one open

bank account at the time of the debtors' filing.  It also had a website; and at least two e-

mail messages sent by Carl Spitko suggest that it may not have been dormant.  Clearly

Maintech had not been dissolved under state law.  Compare In re Hobbs, 333 B.R. at 757

(debtor was not denied a discharge for failing to keep records of a corporation dissolved

several years before the bankruptcy filing); In re More, 138 B.R. at 105 (a failure to keep

corporate records is not a reason to deny a discharge when the corporation had been

dissolved for two years).  Furthermore, the debtors had the ability to make withdrawals

from Sentek.  And Sentek and Maintech had numerous transactions between them.

Additionally, all or virtually all of Carl Spitko's income arose from the operations of

Maintech and later Sentek.

Accordingly, I conclude that the financial records of these closely held

entities were needed in order for the bankruptcy trustee and creditors to have accurate

information concerning the debtors' assets that might be available for liquidation.  See In

re Ross, 1999 WL 10019, at *4-*5:

> [U]nder appropriate circumstances a debtor may be denied a
> discharge based on his failure to keep, maintain or preserve
> records belonging to a separate, but closely held corporate
> entity. The facts of each situation must be analyzed with the
> language and statutory purpose of § 727(a)(3) in mind. . . .
>
> For debtors similar to Mr. Ross, who are heavily invested in a
> closely held corporation, the corporate records may be the
> best measure of the debtor's financial condition. Moreover, in
> subchapter S corporations such as C & R, there is a direct
> interface between a business person's personal finances and
> the finances of the corporation. The tax consequences of the
> business' operations are passed on to the owner through his
> personal income taxes. Where a debtor has some degree of
> control over a closely held corporation, along with access to
> relevant corporate records, the records should be recoverable
> under the statute. If corporate records are not recoverable, the
> entirety of a debtor's business affairs may be immune from
> discovery where they were conducted behind the veil of a
> corporate facade. That result would undercut the effectiveness
> of §§ 521(4), 727(a)(3) and 727(a)(4)(D), in addition to being
> contrary to the equitable nature of bankruptcy law which
> favors substance over form.

(footnote omitted).

Not only were the records of Maintech and Sentek germane to

understanding the debtors' financial condition on the date of their bankruptcy filing, but

the evidence reflects that the records were at best incomplete.  Maintech's records became

72

incomplete around 2002; Sentek never had complete records. There was no reconciliation

done with Sentek's records prior to July 2005 when Carl Spitko hired AccountTemps to

perform a reconciliation.  1 N.T. at 17, 112-13; 2 N.T. at 209-10; 3 N.T. at 85-87.  In a

July 22, 2005 letter to the trustee regarding Sentek's records, Carl Spitko stated: "We had

had [sic] a bookkeeper from Acccountemps [sic] in an attempt to get it current but I have

included an A/R listing that highlights several areas that need to be corrected.  Other areas

of the accounting, such as prepaid expenses and A/P still need work over the next week."

Ex. T-2.  Carl Spitko later admitted that these records, even with the work of

AccountTemps may not be accurate and that he needed to correct them.  1 N.T. at 116; 3

N.T. at 67, 87.  Sentek never prepared a financial statement since the beginning of its

operations except for a single profit and loss statement, and it never filed a tax return.  Ex.

P-12; 1 N.T. at 22, 63, 66.  Although, Sentek used the Quickbooks software program as

its accounting system, not all transactions were properly recorded in that system.  2 N.T.

at 82; 3 N.T. at 11-12, 65-66.

        Similarly Maintech has not filed a tax return since 2001.  1 N.T. at 66.  It

also used a software program to maintain its financial records, referred to as MYOB.  2

N.T. at 206-07; 3 N.T. at 6-8.  The evidence demonstrated that while Maintech

maintained a computer- based software system, many transactions were not recorded in

that system.  In a July 22, 2005 letter, Carl Spitko acknowledged: "This is a copy of the

copy of [sic] what we have right now for Maintech, Inc. and BTR Enterprises.  Neither

one has had any reconciliation work done since early 2002.  They are not accurate but can

provide a picture of the current state of losses for 2002."  Ex. T-2.

Moreover, incomplete records exist concerning transactions among the

Spitkos, Maintech and Sentek.  Therefore, the plaintiffs have demonstrated that the

debtors failed to keep complete records of both Maintech and Sentek.

In addition, some of those records that were preserved were jumbled into a

disorganized pile.  Carl Spitko testified that a large stack of business records was located

at Sentek's facility at the time of the bankruptcy filing, and that they needed to be

reconciled.  1 N.T. at 146-47.  In general, chapter 7 debtors have a duty to keep their

records in an organized fashion.  See Union Planters Bank, NA v. Connors, 283 F.3d 896,

899-90 (7th Cir. 2002); In re Goldstein, 123 B.R. 514, 525 (Bankr. E.D. Pa. 1991) ("The

records must be such as to allow the Trustee, the creditors and the court to meaningfully

reconstruct the debtor's financial status.").  The trustee or the creditors should not be

required to sort through a large mound of documents to reconstruct the debtors' financial

situation.  In the Matter of Scott, 172 F.3d at 970 (computer database which stored the

electronic records was not usable and trustee would have to sort through boxes to

ascertain the financial condition); In the Matter of Juzwiak, 89 F.3d at 429 (a creditor

should not have to reconstruct the debtor's assets); In re Hughes, 873 F.2d 262, 264 (11th

Cir. 1989) ("Hughes may not simply place two sacks of records before the bankruptcy judge and request the judge sift through the documents and attempt to reconstruct the flow of the debtor's assets."); In the Matter of Yeaton, 457 F.2d 803, 803-4 (9th Cir. 1972) (piles of checks and other documents were not enough to ascertain the debtor's financial position); In re Thomas, 2003 WL 21981707, at *10 ("Because courts and creditors should not be forced to undertake an independent investigation of the debtor's affairs, . . . or sift through documents in order to attempt to reconstruct the flow of the debtor's assets, they have a right to be supplied with dependable information on which they can rely in tracing a debtor's financial history.").

Moreover, the debtors' personal financial records were incomplete.  They too had not filed tax returns since 2002; and they had undertaken a number of cash transactions for which third-party corroborative documentation was not provided.

Specifically, the debtors have not filed personal income tax returns since 2001.  1 N.T. at 66, 90.  The debtors only filed extensions for their tax returns for the years 2002 and 2004.  Ex. D-19 at 981-84; 3 N.T. at 66-67.  Although some courts suggest that the failure to file personal income tax returns, without cause, is alone sufficient to deny a debtor a discharge, see, e.g., In the Matter of Pfeilfe, 154 Fed. Appx. 432, 435 (5th Cir. 2005) (quoting In re Dennis, 330 F.3d 696, 701 (5th Cir. 2003)) ("[I]ncome tax returns are the 'quintessential documents' in a personal bankruptcy."); In

re Gartner, 326 B.R. 357, 377 (Bankr. S.D. Tex. 2005) (failing to file tax returns is a basis

for denying a discharge), Congress most likely intended that such failure is a factor under

section 727(a)(3), but not determinative.  See, e.g., In re Strbac, 235 B.R. 880, 884

(B.A.P. 6th Cir. 1999); In re Vetri, 155 B.R. at 785.[14]

       The plaintiffs also complain about several other deficiencies in the debtors'

personal record keeping including: a failure to account for the source of two deposits into

the debtors' bank accounts; a failure to account for how all cash withdrawn from the bank

accounts were spent, other than representing that some was used for ordinary household

---

[14]Such a conclusion is consistent with section 521(e) and (f) added as part of The
Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, enacted on April 20, 2005
and effective on October 17, 2005,  Pub. L. 109-8.  By virtue of section 521(e)(2), chapter 7
debtors are now obligated to provide to the bankruptcy trustee prior to the meeting of creditors a
copy of their "Federal income tax return required under applicable law . . . for the most recent tax
year ending immediately before the commencement of the case and for which a Federal income
tax return was filed."  This requirement may be excused "for circumstances beyond the control of
the debtor."
      Subsection 521(f) provides:

    At the request of the court, the United States trustee, or any party in interest in a
    case under chapter 7, 11, or 13, a debtor who is an individual shall file with the
    court—
                              ***
    (2) at the same time filed with the taxing authority, each Federal income tax return
    required under applicable law . . . that had not been filed with such authority as of the date of the
commencement of the case and that was subsequently filed for any tax year of the debtor ending
in the 3-year period ending on the date of the commencement of the case[.]

      If a chapter 7 debtor must be denied a bankruptcy discharge for the failure to file
prepetition tax returns, it is unlikely Congress would have found it necessary to add these
particular statutory requirements.  Furthermore, the non-dischargeability provisions of section
523(a)(1)(B)(i) would be superfluous.

expenses; and a failure to keep records regarding their lease arrangement with De Lage Landen.

The evidentiary record does reflect that the debtors provided the plaintiffs with numerous documents relating to the financial affairs of Maintech and Sentek, as well as their personal financial affairs, including copies of past bank account statements, copies of money orders, cancelled checks and two spreadsheets prepared by Carl Spitko. The first spreadsheet detailed how the debtors spent their income tax refund for the tax year 1996.  See Ex. P-24.  The second spreadsheet addresses how much cash was withdrawn from the debtors' personal bank accounts between October 2002 and September 2003, and then the manner in which that cash was spent.  Ex. D-22.

In Exhibit D-22, the cash withdrawals were classified in various ways: legal fees, money contributed for items for Maintech, and $23,000 in "household expenses" for 13 months.  Ex. D-22.  The debtors testified that they had paid various household bills with cash.  2 N.T. at 15.  Elizabeth Spitko testified that she did not keep track of how each portion of the cash was spent.  1 N.T. at 198; 2 N.T. at 15.

Section 727(a)(3) expressly excuses a debtor's failure to maintain all necessary financial records when such "failure to act was justified under all of the circumstances of the case."  See generally, e.g., In re Ross, 1999 WL 10019, at *6; In the Matter of Hyers, 70 B.R. at 769-770 (lack of corporate records will not deny a debtor's

discharge when the debtor did not have access to them).  Carl Spitko argues that it was

impossible to engage professionals and employees to preserve and create complete

records for Sentek and Maintech because of their poor financial conditions.  But see

Chusid v. First Union National Bank, 1998 WL 42292, at *6 (subsequent failure of

business was not a sufficient explanation as to why the debtor failed to keep corporate

records).  Furthermore, some courts have held that it was not necessary even for

sophisticated debtors to account for how the cash advances or cash withdrawals were

spent to receive a discharge.  In re Pfeifle, 154 Fed. Appx. at 435-36.

My problem with the debtors' explanation is twofold and related: First,

there were considerable cash transactions involving the debtors, the disposition of which

cannot be corroborated: there is only the debtors' testimony that all funds were properly

spent on reasonable expenses.  Yet certain cash transactions—e.g., the dealings with

David Ellis and the payment in 2003 to John Spitko to repay an undocumented 1986

obligation—place the debtors' credibility that it was impractical to retain records of all

cash transactions in doubt.  Given their desire to avoid Wachovia's execution efforts, the

absence of complete records could be helpful.  Second, the transactions between

Maintech and Sentek, initially documented to some degree, cease being documented soon

after June 2004; and the absence of these records serves to benefit Sentek, an entity

created to hinder and delay Wachovia.  Again, this undermines the debtors' justification

for their absence of records.

The plaintiffs had the burden under section 727(a)(3) to demonstrate that the Spitkos failed to maintain and preserve adequate financial records, and that such a failure made it difficult to ascertain their financial history and circumstances as of their bankruptcy filing. I conclude that the limited records preserved by the debtors makes ascertainment of their assets too difficult for either the trustee or creditors. Having voluntarily filed a chapter 7 bankruptcy petition, the debtors needed to comply with the record-keeping requirement, or provide a persuasive justification for their failure, in order to receive a bankruptcy discharge. See Meridian Bank v. Alten, 958 F.2d at 1234 ("The purpose of section 727(a)(3) is to make full financial disclosure a condition precedent to the grant of discharge in bankruptcy."). Their failure to maintain records is clearly evident; furthermore, their justification for these deficiencies is unpersuasive. Thus, denial of discharge under section 727(a)(3) is also warranted. Id.


V.


Under 11 U.S.C. § 727(a)(4), a debtor will not receive his bankruptcy discharge when he:

knowingly and fraudulently, in or in connection with the case–

79

(A) made a false oath or account;

The purpose of this statutory provision is to create an "affirmative duty" for the debtor to completely disclose "all assets [and] liabilities and to answer all questions fully and with the utmost candor." In re Maletta, 159 B.R. 108, 112 (Bankr. D. Conn. 1993). As recognized by one court, "[t]he purpose of [section 727(a)(4)(A)] is to allow creditors to have adequate information of the [debtor's] estate without the need for an examination or investigation to determine if the statements are correct." In re Kearns, 149 B.R. at 192; In re Gudowitz, 1986 WL 28906, at *4; see also In re Haverland, 150 B.R. 768, 772 (Bankr. S.D. Cal. 1993) ("A trustee or creditor should not be required to make a costly investigation . . . to uncover the existence of property which the debtor knowingly fails to disclose.").

To meet this evidentiary burden, the plaintiffs must prove by a preponderance standard, see In re Georges, 138 Fed. Appx. 471, 472 (3d Cir. 2005), that:

> (1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. False oaths sufficient to justify the denial of discharge include (1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings.

Matter of Beaubouef, 966 F.2d at 178 (citations and quotations omitted); accord, e.g., Williamson v. Fireman's Fund Insurance Co., 828 F.2d 249, 251 (4th Cir. 1987).

80

Thus, "[a]ny false statement made in a bankruptcy petition, schedule or statement of financial affairs constitutes a false oath within the meaning of [s]ection 727(a)(4)(A)." In re Senese, 245 B.R. at 574.  The section also applies to false statements made by the debtor during court proceedings.  In re Braidis, 27 B.R. at 472.

While an omission or false statement caused by an honest mistake or oversight will not be sufficient to deny the debtor a discharge, see also In re Georges, 138 Fed. Appx. at 472, an omission or misstatement made with a "reckless indifference to the truth" will fall within the scope of § 727(a)(4)(A) if the subject matter is material to the administration of the bankruptcy case.  Matter of Beaubouef, 966 F.2d at 178. Furthermore, "[t]he subject matter of a false oath is material, and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."  In re Chalik, 748 F.2d 616, 618 (11th Cir. 1984) (internal quotations omitted).

Proof of actual harm to creditors is unnecessary, In re Keeney, 227 F.3d at 685; In re Chalik, 748 F.2d at 618, and the debtor cannot excuse the omission by claiming the property not disclosed was of little or no value to the bankruptcy trustee.  See Chusid v. First Union National Bank, 1998 WL 42292, at *8; In re Kearns, 149 B.R. at 192 ("[D]etriment to a creditor need not be shown in order to establish fraudulent concealment or a false oath barring discharge.  A recalcitrant debtor may not escape a

81

section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted . . .

information concerned a worthless business relationship or holding; such a defense is

specious.").  In addition, the debtor may be denied his discharge even when he belatedly

provides information about previously undisclosed assets that were already known by the

trustee or creditors.  See In re Chalik, 748 F.2d at 618-19; In re Maletta, 159 B.R. at 112

("A debtor's disclosure of information previously omitted from schedules is some

evidence of innocent intent, but this inference is slight where the debtor . . . amended his

schedules after the trustee or creditors have already discovered what the debtor sought to

hide.").

  Thus, I must consider whether the Spitkos knowingly and fraudulently

made any false statements regarding material facts in their chapter 7 bankruptcy case.  As

discussed above, § 727(a)(4)(A) applies to false statements made on the debtor's

bankruptcy petition and schedules or in court proceedings.  In re Senese, 245 B.R. at 574.

For purposes of a claim under § 727(a)(4)(A), a debtor is required to disclose beneficial

interests in property in addition to direct ownership rights.  See In re Keeney, 227 F.3d at

683-84.

  As noted above, undergirding this analysis of 11 U.S.C. § 727(a)(4)(A) is

that section's purpose of  insuring that the chapter 7 debtor has made honest and accurate

disclosure of his financial circumstances so the bankruptcy trustee and creditors have

sufficient information for the proper administration of the chapter 7 case, without having

to conduct costly investigations.  See In re Aubrey, 111 B.R. 268, 274 (B.A.P. 9th Cir.

1990); In re Burnley, 1999 WL 717215, at *3 (E.D. Pa. 1994).  The bankruptcy process

depends upon the complete and candid disclosure of assets, income, expenses and

liabilities of the debtor.  See generally Oneida Motor Freight, Inc. v. United Jersey Bank,

848 F.2d 414 (3d Cir. 1988) (failure to disclose a claim in a bankruptcy case may estop

the debtor from later asserting that claim).  Thus, it is understood that a debtor's

subsequent amendments to her schedules may rectify an honest mistake, but cannot

expunge any fraud in the falsity of an oath on the original schedules.  See In re Kelly, 135

B.R. 459, 461 (Bankr. S.D.N.Y. 1992); In re Montgomery, 86 B.R. 948, 957 (Bankr. N.D.

Ind. 1988); see also In re Wade, 189 B.R. 522, 526 n.1 (Bankr. M.D. Fla. 1995); see

generally Payne v. Wood, 775 F.2d at 205 ("The operation of the bankruptcy system

depends on honest reporting.  If debtors could omit assets at will, with the only penalty

that they had to file an amended claim once caught, cheating would be altogether too

attractive.  The omission of assets may be a good reason to deny or revoke a discharge.").

  In consideration of when a false statement is made knowingly, one court has

explained:

> A statement is considered to have been made with knowledge
> of its falsity if it was known by the debtor to be false, made
> without belief in its truth, or made with reckless disregard for
> the truth.  Where persuasive evidence of a false statement

> under oath has been produced by a plaintiff, the burden shifts
> to the defendant to prove that it was not intentionally false . . .
> .
>
> Courts may consider the debtor's education, business
> experience, and reliance on counsel when evaluating the
> debtor's knowledge of a false statement, but the debtor is not
> exonerated by pleading that he or she relied on patently
> improper advice of counsel.  Furthermore, a debtor cannot,
> merely by playing ostrich and burying his head deeply enough
> in the sand, disclaim all responsibility for statements which he
> has made under oath.

In re Maletta, 159 B.R. at 112 (internal quotations and citations omitted); see In re

Mitchell, 102 Fed. Appx. 860 (5th Cir. 2004) (reckless indifference to truth supports

denial of discharge under section 727(a)(4)); In re Keeney, 227 F.3d 679, 685-86 (6th Cir.

2000) ("The Court of Appeals for the Seventh Circuit has explained that intent to defraud

'involves a material representation that you know to be false, or, what amounts to the

same thing, an omission that you know will create an erroneous impression.' A reckless

disregard as to whether a representation is true will also satisfy the intent requirement.")

(quoting In re Chavin, 150 F.3d 726, 728 (7th Cir. 1998)).

As just noted, liability under section 727(a)(4) requires that the false

statement was made fraudulently, not inadvertently.  As with § 727(a)(2)(A), fraudulent

intent may be inferred:

> The problems inherent in ascertaining whether a debtor has
> acted with fraudulent intent are obvious.  Ordinarily, the
> debtor will be the only person able to testify directly

84

> concerning his intent.  Because a debtor is unlikely to testify
> directly that his intent was fraudulent, the courts may deduce
> fraudulent intent from all the facts and circumstances of a
> case.

In re Williamson, 828 F.2d at 252 (internal citations omitted); Chusid v. First Union

National Bank, 1998 WL 42292, at *7; In re Senese, 245 B.R. at 575 ("Direct evidence of

fraud is not required; rather, it is sufficient to prove by circumstantial evidence either a

pattern of concealment and errors or other conduct that suggests reckless indifference to

the truth."); In re Braidis, 27 B.R. at 472.  However, § 727(a)(4)(A) does not apply where

the debtor made an inadvertent mistake.  See In re Brown, 108 F.3d at 1294 ("The

purpose of the bankruptcy code is to give the honest debtor a new start.  Thus, we must

not penalize the debtor for an inadvertent mistake."); In re Senese, 245 B.R. at 575.

The plaintiffs in these proceedings complain that the debtors made

numerous false oaths in the disclosures found in their chapter 7 bankruptcy schedules and

statement of financial affairs.  They emphasize the following conduct: the debtors' failure

to disclose payments made within one year of the bankruptcy filing to John Spitko in their

statement of financial affairs; their mis-disclosure of the amount of his debt as well as the

date of his security interest; the mis-disclosure of the date of the second mortgage on their

residence; their omission of any payments made to Sentek within one year of the

bankruptcy filing; their failure to reveal payments made to De Lage Landen and certain

credit card creditors that occurred within 90 days of the bankruptcy filing; their failure to

85

reveal the existence of personal property stored in trailers or held by Sentek, as well as the

existence of certain bank accounts; their failure to disclose that they paid corporate legal

fees to HSH; and their undervaluing their interests in Sentek, Maintech and their personal

property, in comparison with the values given to Wachovia on personal financial

statements.

The debtors concede that the bankruptcy schedules and statement of

financial affairs were incomplete.  They argue though that any such errors were not

intentional and were inadvertent.  No fraudulent intent can be inferred, they maintain,

given that some of the non-disclosures complained of by the plaintiffs are revealed by

analysis in the exhibits attached to their amended schedules.  Furthermore, they maintain

that their property valuations were good-faith liquidation estimates, permitted by

bankruptcy law.

Turning first to the valuation issue, I agree that a debtor's intentional or

reckless failure to reveal the true extent or value of an ownership interest in a corporation

may be a basis to deny a debtor a discharge.  See Chusid v. First Union National Bank,

1998 WL 42292, at *7; In re Erdman, 96 B.R. 978, 980-81 (Bankr. D.N.D. 1988).  The

Erdman court, however, noted the difficulty a debtor may have in valuing his ownership

interest in a closely held corporation:

Valuing a closely held corporation is always difficult and
when that business is heavily dependent upon the

> performance of a single person, this fact is perhaps the single
> most important factor in valuation.  This court has previously
> held, based upon a review of North Dakota case law, that to
> the extent a business consists of the personal services of the
> principal, the business has no value because the continued
> worth of that service is entirely too speculative. . . .
> [However], the fact that there may well have been physical
> assets yet remaining is relevant because to the extent the hard
> business assets held value independent of [the debtor's]
> personal involvement, that value should have been listed on
> the schedules.

Id. at 987.

Furthermore, several courts have concluded that a debtor did not make a

false oath when failing to list an exact value for the stock that he holds in a closely held

corporation, as long as he made a good faith effort to value the stock.  For example, in In

re Poland, 222 B.R. 374, 380-81 (Bankr. M.D. Fla. 1998), the debtor valued his

ownership interest in a corporation at zero.  Id. at 376.  The court found that this was not

grounds to deny the debtor a discharge, as the debtor actually believed the stock had no

value on the date of filing because "his share of stock represents part of a closely held

corporation that requires his full participation in order to be a viable business venture."

Id. at 380.  The court further opined that if the debtor had failed to disclose the existence

of this stock asset, or to improperly describe it, denial of discharge might be justified.  Id.

Similarly, in In re Parnes, a court refused to deny a debtor a discharge when

he valued his 50% ownership in dental practices as unknown.  200 B.R. 710, 715-16

87

(Bankr. N.D. Ga. 1996).  The court found the debtor credible when he testified that he did

not know how to value his interests in the dental practices, especially without a covenant

not to compete.  Id. at 717-18.  Compare In re Ross, 217 B.R. 319, 328-9 (Bankr. M.D.

Fla. 1998) (finding the debtor made a false oath when she valued her stock in a

corporation at $10); In re Dreyer, 127 B.R. 587, 593 (Bankr. N.D. Tex. 1991) (debtors

knew that the corporation had substantial value but still listed the assets as

undetermined.); In re Ligon, 55 B.R. 250, 253 (Bankr. M.D. Tenn. 1985) (finding that the

debtor attempted to conceal the true value of the stock by listing it as unknown).

As to Maintech, the debtors listed its value as $1,100,000 and  $1,200,000

in 2001 and 2002 respectively, in personal financial statements submitted to Wachovia.

Exs. P-19; P-20.  Although Maintech was no longer in operation at the time of the

debtors' bankruptcy filing, it is clear that it had some remaining assets including funds in

a bank account, as well as equipment and office supplies in various locations.  Mr.

Comley, an auctioneer who examined the assets remaining at Maintech's facility in July

2003, valued certain personalty at $21,000.  Statement of Uncontested Facts at 7; 1 N.T.

at 145; 2 N.T. at 187-88.  Carl Spitko testified that the reason that he did not ascribe any

value to his Maintech stock on the debtors' bankruptcy schedules was that "at that point it

was inactive and dormant, and I did not believe that there was any value at that time."  1

N.T. at 22-23.  Furthermore, the evidence disclosed that Wachovia held a lien on all of

Maintech's assets at the time of filing, and that lien was far greater than the value of the

remaining assets.   Upon consideration of all the evidence, I conclude that the debtors did

not make a false oath when valuing their Maintech stock at $0.00.

Sentek was an operating business at the time that the debtors filed

bankruptcy.  It is also clear that it owned various equipment, inventory and office supplies

and had an open bank account.  However, as a closely held corporation, the value of the

debtors' membership interests in Sentek is not readily apparent.  See In re Parnes; In re

Erdman.  Sentek's value relies largely upon Carl Spitko's personal contacts, experience

and skills to generate revenue.  If the debtors' interests in this limited liability company

were offered for sale, it is not obvious what value Sentek would have beyond its physical

assets, if Carl Spitko did not continue his employment.  Accordingly, I do not now find

that the debtors made a false oath when they disclosed their interest in Sentek, but valued

that interest unknown.

Similarly, I find no fraudulent behavior in the debtors' listing of Maintech

creditors on their bankruptcy schedules.  Carl Spitko testified that the reason these

creditors were listed was that he was concerned that they may claim that the debtors were

personally liable for these debts.  2 N.T. at 52; 3 N.T. at 28-29.  (Indeed, Mr. Robert

Mortenson, who held a judgment against Maintech, did file a proof of claim.)  The

debtors informed the trustee at the 341 meeting that they believed that they had no

liability for the Maintech debts, and agreed to list the creditors for notice purposes only as

instructed by the trustee.  See Ex. P-11 at 17-20; 1 N.T. at 40, 167-68; 3 N.T. at 28-29.

Their doing so did not constitute a false oath.

As to other misstatements or omissions in the debtors' schedules and

statement of financial affairs, some of which they concede, the debtors' explanation of

inadvertence is less satisfactory.

I appreciate that Carl Spitko was in Hong Kong on business at the time the

initial bankruptcy documents were prepared.  1 N.T. at 36-37, 167-68.  Elizabeth Spitko

testified that the debtors quickly realized there were errors in those original disclosures

and sought to correct them with the amended schedules.  1 N.T. at 167-68.  I can accept

that explanation, but only to a certain extent.

For example, the debtors, on their initial statement of financial affairs,

stated that payments within the 90-day preference reachback period would be

"submitted"; and their amended schedule makes reference to the bank statements and

money orders attached to the schedules.  Exs. P-10; P-11.  Regarding the pre-bankruptcy

payments to insiders, only HSH is listed on the initial statement in the amount of $0.00;

and the amended statement of financial affairs makes reference to a list of payments

attached as Exhibit B.  Exs. P-10 at 18; P-11 at 2, 186.  Absolutely no disclosure is made

concerning the debtors' payments to John Spitko or to Sentek, both of whom clearly are

insiders within the meaning of section 101(31)(A), within the one year prior to the debtors' bankruptcy filing.

The debtors commenced this bankruptcy case on June 29, 2004. Although the debtors attached to their amended schedules copies of bank statements dating from October 2003, the payments to John Spitko and Sentek during the one-year reachback period would not have been revealed to the trustee or to creditors, because these payments were made prior to October 2003.

John Spitko is Carl Spitko's father, and the recordation of a mortgage in his favor only after the loan default to Wachovia, as well as the significant payment made to him in September 2003—after Wachovia's judgment had been confessed and execution upon that judgment commenced—suggests a desire upon the debtors' part to insure that the obligation to this relative was repaid. Similarly, Sentek was formed to defeat the judgment and lien held by Wachovia against Maintech's and the Spitkos' assets.

Non-disclosure by the debtors of potentially preferential payments or fraudulent conveyances made by them within one-year of their bankruptcy filing would be consistent with the purpose behind these transfers. However, Exhibit P-24, in which the debtors revealed to Wachovia in pre-bankruptcy discovery the disposition of their tax refund, makes reference to some if not all of the transfers to John Spitko and to Sentek. Thus, viewed alone, the failure of the debtors to disclose these payments to insiders might

not be considered intentional or reckless.  But other non-disclosures, when added to these,

support a finding that the debtors were at least reckless in providing information in their

sworn bankruptcy documents.

      For instance, the debtors failed to reveal all of their bank accounts, except

for Commerce Bank, on their initial and amended schedules.  However, with their

amended schedules, the debtors attached past bank statements starting in October 2003.

But the revelation of these bank statements in the amended schedules and statement of

affairs, filed on November 10, 2004, occurred only after the section 341 meeting of

creditors had begun on September 1, 2004 and continued to October 5, 2004—at which

Wachovia likely had a representative present who could have revealed numerous facts not

disclosed in the original schedules and statement of financial affairs to the bankruptcy

trustee—and only after Wachovia filed the instant adversary proceeding.

      In addition, the debtors did not reveal any payments made within 90 days of

their bankruptcy filing to De Lage Landen, to credit card companies or to any law firms

for legal expenses.  And they also failed to disclose property owned by them and stored in

Rentz Storage Facility in Philadelphia and with Sentek.  On their amended Schedule B,

they simply stated that they owned "[u]sed equipment in storage trucks and at storage

warehouse in Minneapolis, MN."  Ex. P-11 at 12.  The debtors stated that there was

indeed property in storage trucks at the Rentz facility and additional property at the

storage warehouse in Minneapolis.  1 N.T. at 38; 2 N.T. at 80  However, the trustee and

creditors would not be aware of the Philadelphia property, but would assume the storage

was in Minnesota.  And the debtors' lack of bankruptcy disclosure is consistent with Carl

Spitko's actions in dealing with Wachovia's appraiser.

Finally, Elizabeth Spitko testified that the debtors may have refinanced their

home and taken out a second mortgage with PNC sometime during 2002 or 2003.  1 N.T.

at 174-76.  This is consistent with the proof of claim filed by this creditor (docketed as

claim #4) asserting that the debtors entered into a mortgage loan with PNC in June 2002.

The debtors' amended schedules, however, represent that the second mortgage was

obtained with PNC in September 2000.  Ex. P-11 at 14.

Since the debtors clearly identified the existence of a second mortgage, as

well as the lender and the amount of the loan, an error in disclosing the true date the

mortgage was incurred, by itself, might not rise to the level of a false oath.  However, the

debtors also disclosed in their amended schedules that John Spitko held a third mortgage

dated December 2000.  As noted earlier, this mortgage was dated December 2000 but

actually recorded years later, in April 2003.

It is likely that the debtors sought not to disclose that the recordation of the

John Spitko mortgage only occurred in April 2003, for it might be subject to challenge as

a fraudulent conveyance.  It is probable that PNC entered into the loan transaction with

93

the debtors without any knowledge of an unrecorded mortgage held by John Spitko.  If

the debtors properly scheduled the PNC mortgage as arising in June 2002, but John

Spitko's mortgage as dating from December 2000, PNC would be in third position.  A

challenge might arise, either by or against PNC, which would reveal the true facts.  Thus,

the only method to assert in this bankruptcy case that PNC held a second mortgage and

that John Spitko held a third mortgage dated December 2000—without revealing the

actual date of recordation—required the debtors to list PNC's lien on their schedules as

incurred prior to December 2000.  Thus, the debtors' scheduling the PNC mortgage loan

as incurred in September 2000, rather than June 2002, would suit that purpose, rather than

be inadvertent.

In sum, the debtors in their sworn bankruptcy schedules and statement of

financial affairs, both original and amended, did not provide complete disclosure about

their property, their bank accounts, their pre-bankruptcy payments to creditors and

insiders, and the actual date of mortgage perfection.  Such errors are too numerous, and in

some instances are consistent with pre-bankruptcy behavior, as likely to be the product of

inadvertence alone.  See, e.g., In re Mitchell; In re Abramov, 329 B.R. 125, 134-35

(Bankr. E.D.N.Y. 2005); In re Boone, 236 B.R. 275, 280 (Bankr. M.D. Fla. 1999):

> There is no question that an omission of an asset from the
> Schedule which is isolated may be due to inadvertence or
> carelessness and may not suffice to sustain a claim of false
> oath. It is equally true that a series of omissions which reveals

94

a pattern would support the claim that the Debtor committed
false oath in connection with the execution of the Statement
of Financial Affairs and Schedule of Assets. Thus, numerous
omissions of assets may constitute a pattern demonstrating
either an intentional false oath or a reckless disregard for the
truth.

They rise at least to the level of recklessness, and, in some instances, were

likely designed to create erroneous impressions.  See In re Keeney, 227 F.3d at 685.  For

these reasons, I conclude that the debtors should also be denied a discharge under section

727(a)(4).


VI.


Finally, a chapter 7 debtor's discharge may be denied under § 727(a)(5) if

"the debtor has failed to explain satisfactorily, before determination of denial of discharge

under this paragraph, any loss of assets or deficiency of assets to meet the debtor's

liabilities."  11 U.S.C. § 727(a)(5).  The moving party in the objection to discharge

proceeding has the initial burden of proof by a preponderance standard.  See, e.g., In re

Ishkhanian, 210 B.R. 944, 953 (Bankr. E.D. Pa. 1997) ("The objector must produce some

evidence of the disappearance of substantial assets or of an unusual transaction which

disposed of assets.").  Once the moving party has satisfied the initial burden of proof, the

burden shifts to the debtor to satisfactorily explain the loss of assets.  In re Chalik, 748

95

F.2d at 619; <u>see</u> <u>In re Reed</u>, 700 F.2d 986, 992-93 (5th Cir. 1983) ("The creditor's burden

of persuasion does not obviate the necessity that the debtor provide a satisfactory

explanation of the loss of his assets.").

      Whether a debtor's explanation is satisfactory is a "question of fact" to be

determined by the fact finder.  <u>In re Chalik</u>, 748 F.2d at 619; <u>In re Costello</u>, 299 B.R. 882,

(Bankr. N.D. Ill. 2003).  "Although the explanation need not be far-reaching and

comprehensive, it must consist of more than a 'vague, indefinite, and uncorroborated

hodgepodge of financial transactions.'"  <u>In re Costello</u>, 299 B.R. 882, at *22 (quoting <u>In</u>

<u>re Potter</u>, 88 B.R. 843, 849 (Bankr. N.D. Ill. 1988)); <u>see</u> <u>In re Sendecky</u>, 283 B.R. 760,

766 (B.A.P. 8th Cir. 2002); <u>see</u> <u>In re Green</u>, 268 B.R. 628, 650 (Bankr. M.D. Fla. 2001)

(debtor provides only a vague explanation as to what happened to the lost assets); <u>In re</u>

<u>Carter</u>, 236 B.R. 173, 180 (Bankr. E.D. Pa. 1999) ("Some type of believable, direct

evidence will be required to defeat an objection based on failure to explain a loss of

assets.").

      "Courts are not concerned with the wisdom of a debtor's disposition of

assets but, instead, focus on the truth, detail, and completeness of the debtor's explanation

of the loss."  <u>In re Self</u>, 325 B.R. 224, 250 (Bankr. N.D. Ill. 2005).  As noted by one

court:

      The depletion of an asset stemming from the need to meet
      everyday living expenses is a commonly used, and in

> appropriate circumstances will constitute a satisfactory
> explanation for purposes of § 727(a)(5). . . .  At least, in part,
> this is a reflection of the reality that as a debtor slides into
> bankruptcy, assets may need to be utilized to make up any
> shortfall in expenses over income.  Utilizing living expenses
> as an explanation for the loss of an asset, however, brings
> forth two competing interests.  First, expenses are easy to
> manipulate, especially for discretionary items such as food
> and entertainment.  At the same time, it is simply not realistic,
> especially the more time that passes, to expect a debtor to
> account for every penny spent.

In re Reed, 310 B.R. 363, 370-71 (Bankr. N.D. Ohio 2004); see In re Phouminh, 339 B.R.

231, 248-49 (Bankr. D. Colo. 2005) ("The nature of the asset under consideration here is

cash in the form of current income as opposed to tangible assets or even assets

accumulated in investment or similar accounts.  Given the nature of those cash assets, it is

unrealistic to expect a strict accounting for every dollar.  But, in this case, there is more

than $400,000.00 for which there has been no appreciable effort to account."); In re

Sword, 93 B.R. 757, 759-60 (Bankr. M.D. Fla. 1988) (debtor's explanation that

$54,741.44 in fourteen months was used for living expenses was not sufficient).  But see

In re Ryan, 285 B.R. 624, 632 (Bankr. W.D. Pa. 2002) (explanation was satisfactory when

previously funds went towards the operation of two businesses); In re Bernard, 99 B.R. at

571 (debtor satisfactorily explained that past income was spent on living expenses); In re

Carter, 236 B.R. at 181 (no satisfactory explanation when the debtor asserts the money

was spent on living expenses without producing any evidence).

97

Whether there has been a satisfactory explanation for the disposition of assets is within the discretion of the bankruptcy court.  See In re Mezvinsky, 265 B.R. 681, 689 (Bankr. E.D. Pa. 2001).  Moreover, "for the purposes of a § 727(a)(5) inquiry, the court is not concerned with whether the disposition of the assets was proper under the Bankruptcy Code, but rather only whether the explanation satisfactorily describes what happened to the assets."  Id., at 690.

The plaintiffs primarily contend that there is an unexplained loss of value in the debtors' personal property, as identified and valued in their 2001 and 2002 personal financial statements, and as valued on the debtors' bankruptcy schedules.[15]  See Chusid v. First Union National Bank, 1998 WL 42292, at *4-5 (E.D. Pa. 1998) (debtor failed to account for the difference between the valuations); In re Mezvinksy, 265 B.R. at 693 (a $775,000 difference in the values was not satisfactorily explained); In re Beshears, 196 B.R. 468, 473 (Bankr. E.D. Ark. 1996) (debtors failed to explain an over $300,000 diminution of value of equipment and personal property in less than one year).  They offer no specific evidence, however, that identifiable items of personal property have been depleted, except for vehicles and cash.  They infer from the different values, however, that the debtors' assets must have been lost, and that the debtors have not provided a

---

[15]Insofar as real property is concerned, the debtors' interest in BTR and its realty was explained by the prepetition sale of the real property and the payment of those proceeds to Wachovia.

98

sufficient explanation for this loss.

More specifically, the plaintiffs argue that: the debtors failed to explain the disposition of cash assets, in particular $80,000 to $90,000 kept in the debtors' home; they failed to explain the loss of value of retirement accounts; they failed to explain the loss in value of automobiles and their residence; they failed to explain the loss in value of Maintech and Sentek; and they failed to explain the disposition of income obtained prior to the bankruptcy filing.

Here, the Spitkos reply that diminution in value between their personal financial statements in 2001 and 2002 and their bankruptcy schedules occurred, not because assets were dissipated, but because the former used replacement and fair market valuations, while the latter utilized liquidation or forced sale values on the assets. They further contend that the value of their interest in Maintech was eliminated by Wachovia's execution efforts and, as noted earlier, the value of Sentek for liquidation purposes is uncertain. They also assert that some property has depreciated (e.g., automobiles) and some vehicles were sold. The valuation of their home on their bankruptcy schedules, they testified, was based upon an appraisal. And they believe they adequately explained the expenditure of cash. Finally, they contend that the plaintiffs have misread the retirement account information on their personal statements, and that the information therein disclosed is consistent with their bankruptcy schedules.

99

On the debtors' 2001 and 2002 personal financial statements, they valued their personal property at $48,000 and $100,000 respectively. See Exs. P-19; P-20. In contrast, the debtors indicated the value of their personal property on their amended schedules as follows: Furniture ($10,000), Clothing ($1,000), Jewelry ($1,300), Equipment ($90), and Stored Equipment ($6,000), for a total of $18,390. Ex. P-11 at 10-12. The debtors assert that they have the same items of personal property when they filed bankruptcy as they did went they completed the financial statements. 1 N.T. at 88. The debtors have not sold any assets of value since 2002 nor have they gifted any item over $100 in the last two years. Id. at 172-73. Since 2003, they have purchased a new gas grill and a laptop computer. Id.

I note that some courts have accepted that "a difference in valuation methodology can be a satisfactory explanation for a diminution of assets when supported by evidence." In re Poland, 222 B.R. at 382; see ITT Commercial Finance Corp., 115 B.R. 353, 356 (Bankr. N.D. Fla. 1990) (debtor explained the loss of assets from the date of the financial statement). Indeed, the debtors here testified that the difference between the values on their financial statements and their bankruptcy schedules results from the methodology used and by depreciation.

Carl Spitko testified that he used replacement value for the financial schedules and liquidation value for the bankruptcy schedules. 1 N.T. at 89-90; 2 N.T. at

175-78; 3 N.T. at 52.  Many of the household furnishings were several years old and have

diminished value from when they were originally purchased.  1 N.T. at 170-72.  It is

apparent that it would cost significantly more to replace these items with new items than

they would bring at a liquidation auction.

Without some evidence that the debtors' personal financial statements

revealed assets not mentioned, and my finding that the debtors' use of liquidation value

was not improper, the plaintiffs have not met their burden on this point under section

727(a)(5).

There was evidence that the debtors no longer owned vehicles when they

filed their bankruptcy petition that had been owned previously and identified on their

personal financial statements.  In their 2001 financial statement, the debtors listed

$65,000 worth of automobiles and with automobile liens of $32,000.  Ex. P-19 at 2.  In

their 2002 financial statement, they valued the automobiles at $60,000 with no

automobile liens.  Ex. P-20 at 2.  Carl Spitko testified that when they completed both

financial statements they owned the same automobiles: a Toyota Avalon, a Chrysler

Sebring, a Honda Accord and a 1987 Mazda truck.  2 N.T. at 191-93.  On the debtors'

bankruptcy filings, they list "1987 Mazda B2000 Pick up Truck" worth $100 and a 2003

Saturn Ion valued at $13,000.  Ex. P-11 at 10-12.  Additionally, their amended schedule G

lists an unexpired lease for a 2002 Mazda MPV.  Id. at 21.

101

The debtors have put forth a satisfactory explanation for the differences in automobile values. They stated that by the time of their bankruptcy filing, they had sold the Avalon and the Accord and traded the Sebring for the Saturn. 2 N.T. at 191-3. Carl Spitko stated that he received very little cash proceeds from these transactions. Id. Thus any loss in value involving the debtors' vehicles was adequately explained.

The plaintiffs also challenge the change in value of the debtors' personal residence. In their personal financial statements, the debtors valued their home at $750,000 in 2001 and $910,500 in 2002. See Exs. P-19 at 2; P-20 at 2. But in 2004, on their bankruptcy schedules, they valued their home at only $715,000. Ex. P-11 at 9. That is a difference of $195,000 between the 2002 financial statement and the debtors' bankruptcy schedules.

However, the debtors explained this difference in value by testifying that they provided the 2002 value of $910,500 based on the opinion of a real estate agent. 2 N.T. at 172-73. They obtained the recent value of their home, used on their bankruptcy schedules, by consulting a recent appraisal. 1 N.T. at 20-21; 2 N.T. at 174-75; 3 N.T. at 32-34. Based upon this testimony, I conclude that the debtors satisfactorily explained the change in value of their realty.

Similarly, the plaintiffs argue that the debtors failed to explain adequately the loss of value in Maintech. The debtors valued Maintech at $0 and Sentek as unknown

on their bankruptcy schedules.  On the 2001 financial statement, they valued Maintech at $1,100,000.  Ex. P-19 at 2.  On the 2002 financial statement they valued "other assets" including Maintech at $1,200,000.  Ex. P-20 at 2.  The debtors provided an explanation for this difference in value by stating that at the time they valued Maintech in the financial statement, Maintech was an ongoing, profitable business.  2 N.T. at 179-80.

As noted earlier, the debtors did not make a false oath when they indicated that Maintech had zero value.  I cannot find that the debtors failed to satisfactorily explain the loss of value in Maintech.  Further, Sentek was not in existence before 2003 and so was not included in those personal financial statements.

Plaintiffs' next challenge is that the debtors allegedly failed to explain the loss in value in their IRA retirement accounts.  The debtors had the same retirement accounts in 2002 as at the time of their bankruptcy filing.  2 N.T. at 194-96.  On their bankruptcy schedules, they listed the value of various IRA accounts at $166,632.08.  Ex. P-11, Schedule C.   On their 2002 financial statement, they referred to a "schedule A" for retirement accounts.  Schedule A listed numerous accounts at a total value of $334,700.  Ex. P-20.  However, if one reviews the items on schedule A of the 2002 personal financial statement, it is apparent that the debtors have listed more than retirement accounts.  The $334,700 total includes bank account, stock accounts, and money market accounts, as well as tax deferred retirement accounts.

The value of the retirement accounts from 2002 ($107,400) is reasonably consistent with the value disclosed on the bankruptcy schedules. Therefore, there was no evidence of loss of retirement assets.

There is evidence, however, that the debtors swore in their bankruptcy schedules that they no longer had the assets in the non-retirement accounts listed on their 2002 financial statement. Similarly, in 2002, the debtors reported combined annual income of $557,800 and annual expenditures of $276,400. Ex. P-20. Thus, unless circumstances changed, it appears that their assets should have increased from the date of the 2002 financial statement.

Earlier, I referred to the debtors' disposition of cash assets prior to their bankruptcy filing. Elizabeth Spitko testified that during a period of time the debtors began to withdraw a large amount of cash from their bank accounts. 1 N.T. at 193-96; 2 N.T. at 11-12. She could not specify when the various withdrawals occurred, but it is probable that they took place before October 2003. 1 N.T. at 198. The amount of cash was estimated to total $80,000 and $90,000 over a period of time, 1 N.T. at 193-96, during which the debtors stored the cash in their home. 2 N.T. at 11-12. The substantial cash withdrawals ceased when the debtors began paying their debts with money orders in October 2003.

Carl Spitko prepared a spreadsheet to explain the disposition of this cash.

The total amount of this cash is $101,000 including money for legal fees, refurbishment

and preparation of the 860 Welsh Road property, cash contributed to Maintech, money

used on business trips to China and for household expenses, and payments made to John

Spitko.  Ex. D-22.  Among these items is $23,000, which the debtors list as "approximate

amount of cash necessary to run the household for 13 months."  Ex. D-22 at 4.  The

debtors do attach copies of money orders used for some expenses, but they date from a

later time period.  See Ex. P-11 at 115-150.

       The plaintiffs' evidence clearly reflects the debtors' significant loss of

assets between April 2002, when the personal financial statement was completed, and

June 2004, the date of their bankruptcy filing.  The debtors' explanation for that loss

involves the lack of continued profitability of Maintech—and thus Carl Spitko's loss or

reduction of income—and Wachovia's lawsuit and collection efforts.  In effect, the

debtors maintain that they spent a lot of money on continued household and business

expenses, legal fees, partial payments to Wachovia, and payments to John Spitko,

Maintech and Sentek, while deriving reduced income from the two corporations.  Some

but not all of their explanation can be corroborated.

       The plaintiffs do not dispute that Maintech suffered financial reversals in its

business operations.  There is no dispute that Wachovia sought to recover on its confessed

judgment.  Commercial realty was sold to pay Wachovia; and Wachovia did recover the

proceeds of certain Maintech receivables.  The debtors produced some documents

reflecting certain expenses or creditors paid with the proceeds of their assets.

In my previous analysis of section 727(a)(3), I concluded that the debtors

failed to retain sufficient records, given their educational and business experience levels,

to meet the statutory requirement.  It does not follow, however, that such a lack of records

requires that their oral explanation for the disposition of assets must be rejected.  See In re

Young, 346 B.R. 597, 619 (Bankr. E.D.N.Y. 2006):

> In this Court's view, the preferable rule would not mandate
> denial of discharge for failure to produce corroborating papers
> where the debtor's testimonial explanation bears sufficient
> credibility.  An interpretation of 11 U.S.C. § 727(a)(5)
> mandating documentary corroboration in all instances at a
> peril of losing a discharge would impermissibly strip purpose
> and meaning from 11 U.S.C. § 727(a)(3), an independent and
> separate basis for denying discharge.

(citing In re Bodenstein, 168 B.R. 23, 34 (Bankr. E.D.N.Y. 1994)); see also In re

Hamilton, 306 B.R. 575, 586 (Bankr. W.D. Ky. 2004).[16]  Nor does my finding that the

debtors transferred and concealed assets to hinder and delay Wachovia also require the

conclusion that the disposition of assets is unexplained.  See also In re Halperin, 215 B.R.

321 (Bankr. E.D.N.Y. 1997) (granting debtor's cross-motion for summary judgment on

---

[16]A court may accept a debtor's oral explanation for the disposition of assets under
section 727(a)(5), without finding the absence of corroborating documents as justified under
section 727(a)(3).  See In re Cromer, 214 B.R. 86 (Bankr. E.D.N.Y. 1997); cf. In re Buzzelli, 246
B.R. 75, 117-18 (Bankr. W.D. Pa. 2000) (discussing the interplay between section 727(a)(5) and
727(a)(3) as concerns non-corroborated testimony of the debtor).

section 727(a)(5), but denying the cross-motion for summary judgment on section

727(a)(2)(A)).  Placing assets in storage and transferring funds to Sentek or John Spitko

explains what happened to those assets.  See generally  In re Lee, 309 B.R. 468, 480, 481

(Bankr. W.D. Tex. 2004) (relief under section 727(a)(5) is denied when the disposition of

the asset is known).

Although I find the issue very close, given the fresh-start policies implicit in

evaluating a denial of discharge claim and the partial corroboration of the debtors'

explanation, I am willing to accept their explanation for the loss of assets between 2002

and 2004 for purposes of section 727(a)(5) only.  In essence, their lack of substantial

corroboration is addressed by section 727(a)(3).

Accordingly, application of section 727(a)(5) should not preclude the

debtors' chapter 7 discharge on the evidence presented.

VII.

In summary, after considering three days of testimony and numerous

exhibits, I conclude that the plaintiffs have demonstrated by a preponderance of the

evidence that: the debtors transferred and concealed property with an intent to hinder and

delay their creditor, Wachovia Bank, within one year of their bankruptcy filing; the

debtors unjustifiably failed to keep or preserve records from which their financial

condition might be ascertained fully; and they made false oaths in the submission of their

bankruptcy schedules and statement of financial affairs.  Therefore the debtors are denied

a discharge under § 727(a)(2)(A), (a)(3) and (a)(4).

An appropriate order shall be entered.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| CARL SPITKO and | : | |
| ELIZABETH GOETZ-SPITKO | | |
| | : | |
| Debtors | | Bankruptcy No. 04-18836 |

_____

| | | |
|---|---|---|
| WACHOVIA BANK, N.A. | : | |
| Plaintiff, | : | |
| v. | : | Adversary No. 04-975 |
| CARL SPITKO, and | : | |
| ELIZABETH GOETZ-SPITKO | | |
| | : | |
| Defendants | | |

_____

| | | |
|---|---|---|
| HOWARD GLASSMAN, Trustee | : | Adversary No. 04-1049 |
| Plaintiff, | : | |
| CARL SPITKO, and | : | |
| ELIZABETH GOETZ-SPITKO | | |
| | : | |
| Defendants | | |

_____

.................................................

ORDER

.................................................

AND NOW this 23rd day of October 2006, for the reasons stated in the

accompanying opinion, it is hereby ordered that judgment is entered in favor of the

plaintiffs and against the defendants.  The debtors are denied a bankruptcy discharge

pursuant to 11 U.S.C. § 727(a)(2)(A), (a)(3), and (a)(4).


_____
BRUCE FOX
United States Bankruptcy Judge



copies to:

Rosetta B. Packer, Esquire
McCarter & English, LLP
Mellon Bank Center
1735 Market Street, Suite 700
Philadelphia, PA 19103

Albert A. Ciardi , III, Esquire
Ciardi & Ciardi, P.C.
One Commerce Square
2005 Market Street, Suite 2020
Philadelphia, PA 19103

Mr. Carl Spitko
Mrs. Elizabeth Goetz-Spitko
1232 Valley Road
Rydal, PA 19046

Joshua A. Gelman, Esquire
Kenneth J. Lafiandra, Esquire
Jacobs Law Group, PC
1800 J.F.K. Blvd., Suite 404
Philadelphia, PA 19103